UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF GUAM

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 18-CR-00010 |
|  | ) |  |
| Plaintiff, | ) | July 18, 2023 |
|  | ) | 8:40 a.m. |
| vs. | ) |  |
|  | ) |  |
| JOHN D. WALKER, | ) |  |
|  | ) | U.S. District Court |
| Defendant. | ) | 520 W. Soledad Avenue, Fl 4 |
|  | ) | Hagatna, Guam  96910 |
| _____ | ) |  |


TRANSCRIPT OF HEARING ON MOTION FOR RECONSIDERATION OF RELEASE
BASED ON EXCEPTIONAL REASONS PURSUANT TO 18 U.S.C. 3145(c);
MOTION TO GRANT MOTION FOR RECONSIDERATION OF RELEASE
BEFORE THE HONORABLE FRANCES M. TYDINGCO-GATEWOOD
UNITED STATES CHIEF JUDGE

<u>APPEARANCES:</u>

| | |
|---|---|
| For Plaintiff: | Benjamin Petersburg, Esq.<br>U.S. Attorney's Office<br>Sirena Plaza<br>108 Hernan Cortez, Suite 500<br>Hagatna, GU  96910 |
| For Plaintiff: | Marie L. Miller, Esq.<br>Department of Transportation<br>1200 New Jersey Avenue SE<br>7th Floor<br>Washington, D.C.  20590 |
| For Defendant: | Mack K. Martin, Esq.<br>Kristina M. Ault, Esq.<br>Fifth Floor, 125 Park Avenue<br>Oklahoma City, OK  73102 |
| For Defendant: | Vanessa L. Williams, Esq.<br>GCIC Building, Suite 500H<br>414 West Soledad Avenue<br>Hagatna, GU  96910 |

APPEARANCES: (Continued)


Court Recorder:                    Leilani Hernandez

Transcription Service:             Jessica B. Cahill, CER/CET-708
                                   Maukele Transcribers, LLC
                                   467 Maukele Place
                                   Wailuku, Maui, HI  96793
                                   Telephone: (808)244-0776


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

JULY 18, 2023                                        8:40 A.M.

          THE DEPUTY:  Please rise.  The District Court of Guam
is now in session.   The Honorable Frances Tydingco-Gatewood
presiding.

          THE COURT:  All right.  Please be seated.  Let's call
the case up.

          THE DEPUTY:  Your Honor, this is criminal case number
18-00010, United States of America v. John D. Walker on motion
hearings for motion --

          THE COURT:  Okay.

          THE DEPUTY:  -- for reconsideration of release based on
exceptional reasons pursuant to 18 USC Section 314C and motion to
grant motion for reconsideration of release based on exceptional
circumstances or in the alternative get at hearing on the motions
as soon as practical.

          Counsel, please state your appearances.  We'll start
with the Government, please.

          MR. PETERSBURG:  Good morning, Your Honor.  Ben
Petersburg for the United States and I believe we have counsel on
video as well.

          THE COURT:  Okay.  Go ahead.

          MS. MILLER:  Hafa Adai, Your Honor.  Marie Miller on
behalf of the United States and with me is Special Agenda Glenda
White.  And I believe Special Agent Kombunksa is also in the
courtroom.

 1          THE COURT:  Okay.  Yeah.  Oh, there he is.  Okay.

 2   Agent Kombunksa.  Okay.  You can come up if you want, agent. You

 3   don't why to?  Why?  Are you nervous to be back in court?

 4          MR. KOMBUNKSA:  I'm not dressed well for

 5   (indiscernible).

 6          THE COURT:  That's all right.  You can come up.  You're

 7   fine.

 8          MS. MILLER:  I think he's worried, Your Honor, he might

 9   be on the witness stand for another 10 days.

10          THE COURT:  Oh, well, I wasn't going to allow that.  I

11   didn't think that would be necessary.

12          All right.  For the Defense?  Thank you.  Good morning.

13          MS. WILLIAMS:  Good morning, Your Honor.  Vanessa

14   Williams on behalf of Defendant, John Walker.  And I believe pro

15   hac vice counsel is on the line.

16          THE COURT:  Okay.  Counsels --

17          MR. MARTIN:  Your Honor, Mack Martin is appearing.

18   Along with me is Kristin Ault.  She's new to the case.  She's a

19   former Assistant U.S. Attorney for 15 years out of the Northern

20   District of California.  A law clerk for the United States Court

21   of Appeals for the Seventh Circuit for the Honorable Joel Flaum.

22   She's tried over 15 -- over 50 -- 20 jury trials and done over 50

23   complex appellate cases, Your Honor.  She will probably be

24   arguing the bulk of this motion with -- for the Court.  I believe

25   she's online, Your Honor.

```
 1              THE COURT:  Okay.

 2              MS. AULT:  Good morning, Your Honor.

 3              THE COURT:  Good morning.  Okay.  I guess I get -- can

 4   I see that on my computer?  Am I allowed to or I can push it, or

 5   we only see us?

 6              THE CLERK:  Yeah.

 7              THE COURT:  I can't see them?  Okay.  I have to look in

 8   your computer there.  So, who am I talking to?

 9              All right.  I'm sorry.  So Mr. Martin, you are online

10   and you're with Ms. Ault?  Is it that -- is that her last name?

11              MR. MARTIN:  Yes, Your Honor.

12              THE COURT:  Okay.  Ms. Ault --

13              MS. AULT:  Good morning, Your Honor.

14              THE COURT:  Okay.  Hafa Adai and good morning, Ms.

15   Ault.  And then from -- okay, so we have Mr. Walker here.  Ms.

16   Williams is also present with Mr. Martin and Ms. Ault.  Anybody

17   else?  Oh.  And then we also have our US Probation Officer, Mr.

18   Ventura, also present.

19              Okay.  We're ready to proceed.  This is a motion for

20   release of Mr. Walker, based on exceptional circumstances and

21   motion for reconsideration as well.  So we'll go ahead and have

22   Defense begin.  Okay.  So I would like to see if I could see her

23   when she's speaking.  Okay.  Walter?

24              THE DEPUTY:  Yeah.

25              THE COURT:  Okay.  There we go.  Huh?  Can -- he can't
```

1   put this on my computer?  Ask, because I usually can see them,

2   but I'll go ahead and allow her to begin anyway.

3           THE DEPUTY:  Are you logged on there?

4           THE COURT:  I am.  I'm on.  Okay.  Hold on a second.

5   You want to -- give me a second.  We are -- ever since the

6   typhoon, we're trying to adjust here.  There you go.  Oops.

7   Okay.  You want to do it?  Okay.  If you guys can give us one

8   second.  I just want to -- I don't -- I can't see the off-island

9   counsel on my screen and at the bench.  So I would kind of like

10  to see who's speaking.

11          Sorry, off-Island counsels.  Just FYI, we're trying to,

12  again, connect our FTR, which I think we've gotten it taken care

13  of.  Okay.  We're good.  And just one more thing.  We're trying

14  to make sure that your Zoom connection -- our Zoom connection is

15  connected to my bench.  It usually is.  I don't know why it

16  isn't.

17          All right.  We'll go ahead and begin while they're

18  still trying to fix up my computer.  I can still see Ms. Ault.

19  So is it -- Mr. Martin, are you indicating that Ms. Ault will go

20  ahead and begin or she's going to argue the entire motions here

21  before the Court?

22          MR. MARTIN:  Your Honor, for the most part, Ms. Ault

23  will argue, but there are some factual information, if it comes

24  to it, that I'm more privy to than she is, so we'll begin with

25  her and she's -- you'll probably find she's much pleasanter and

```
 1  more articulate than I ever was.

 2          THE COURT:  Well, you're not too bad.  You're good.

 3  You're fine.  All right.  Go ahead, Ms. Ault, you may begin then.

 4          MS. AULT:  Good morning, Your Honor.

 5          THE COURT:  Good morning.

 6          MS. AULT:  Mr. Walker should be released on bond

 7  pending sentencing because there are exceptional reasons why his

 8  detention is not appropriate and he does not present a likely

 9  risk of flight or danger to the community.  I want to start by

10  making sure that we're all on the same page about what standard

11  we're talking about here.

12          We're talking about release under 18 U.S.C. Section

13  3145(c).  Under that provision, exceptional -- the Court shall

14  release the Defendant if exceptional reasons why detention should

15  not be appropriate exist and if it finds by clear and convincing

16  evidence that he is not likely to flee or pose a danger to the

17  community.  The Court does not need to find that it would grant a

18  motion for judgment of acquittal.

19          The Court does not need to find that Mr. Walker has

20  arguments on appeal that will result in the reversal of all of

21  his convictions, although we do think that eventually he will.

22  The Court only needs to find one or more exceptional reasons why

23  detention is not appropriate.  The Ninth Circuit has recognized

24  that there is a broad -- that this Court has broad discretion to

25  consider exceptional reasons, including a wide variety of
```

1  factors.  And the Court may consider those factors alone or in

2  combination.

3        Now, we have identified two factors in this case that

4  are particularly applicable here that the Ninth Circuit has

5  specifically recognized as exceptional reasons in the context of

6  3145C.  The first is that Mr. Walker has a strong argument that

7  challenges both an element of the offense and the basis for the

8  application of the Mandatory Detention Act.  And that's his

9  challenge to the resulting in death finding on Count 10.  And the

10  second is an unusual delay in producing the transcripts through

11  no fault of the court reporter, simply the press of work that

12  sometimes happens in the trial court, but it is unusual in this

13  case.

14        So talking about the first exceptional circumstance,

15  that Mr. Walker has a strong argument challenging an element of

16  the offense that is the basis for the application of the

17  Mandatory Detention Act.  This exceptional circumstance comes

18  from a case called United States v. DiSomma, which originated in

19  the Second Circuit, but which the Ninth Circuit recognized in the

20  Garcia case as an exceptional reason that the Ninth Circuit

21  recognizes.

22        And in the DiSomma case, this was a conspiracy to

23  commit Hobbs Act robbery case.  And the defendant in that case

24  was subject to the Mandatory Detention Act, because the court

25  found that conspiracy to commit Hobbs Act robbery was a crime of

violence. Now, the defendant challenged that and the court found that that was a significant challenge, that conspiracy to Hobbs Act robbery likely was not a crime of violence. And the court said because the element of the crime he called into question was precisely the element that subjected him to the higher detention standard in the Mandatory Detention Act, that that was an unusual factual and legal situation that counted as an exceptional reason, because if the defendant was successful in challenging that element, he would have been detained unjustly.

Mr. Walker is in exactly the same situation here. The resulting in death finding of Count 10 is the only thing that subjects him to the higher standards in the Mandatory Detention Act, because it's the only thing that subject subjects him to life in prison. None of the rest of his convictions are drug trafficking offenses or crimes of violence, which are the other things that will bring a crime within the -- or a conviction within the Mandatory Detention Act and the Government does not contest that.

And as demonstrated in our motion papers, Mr. Walker has several substantial challenges to Count 10, specifically challenges to the jury instructions as well as the sufficiency of the evidence. If he is successful on any of those challenges, then Count 10 of the resulting in death finding in Count 10 will be reversed. The Mandatory Detention Act will not apply and just as in DiSomma, Mr. Walker will have been detained unjustly.

1           The Government doesn't seriously contests that Mr.

2    Walker's challenge to Count 10 has merit.  They cite to evidence

3    that crash -- crashes occurred, that someone died, but they do

4    not cite to any evidence in the record about causation.  This

5    evidence was supposed to come from Mr. Gazetti, but he did not

6    testify that any death was caused by aircraft parts fraud, nor

7    could he.

8           He was not qualified to testify as to the cause of

9    death.  He's not a coroner, he's not a physician and the

10   Government didn't call any other witnesses who could be qualified

11   to testify as to the cause of death.  And so that evidence simply

12   wasn't presented at trial.  And so, when we are making our post-

13   trial motions, we will certainly be asking the Court to reverse

14   the resulting in death finding.

15          At this point, we only need to show that Mr. Walker has

16   a substantial challenge to that finding, which we believe we have

17   made.  And if he does, then that takes this case outside of the

18   Mandatory Detention Act.  It is an exceptional circumstance, as

19   the Ninth Circuit has found.  And once he is out of the Mandatory

20   Detention Act, then he is treated just like any other defendant

21   and he can be released, if he is not likely to flee or pose a

22   danger to the community.

23          Now, the second factor is the unusual delay in the

24   production of transcripts, which delays sentencing and appeal.

25   Here, the court reporter has stated that due to an unusually

1   heavy workload -- again, no fault of hers, she does not expect to

2   complete the transcripts until October, which is over one year

3   after the end of trial.  Now, the Ninth Circuit recently issued a

4   notice for those of us who are in appellate practice and it was a

5   little disconcerting, regarding the extensions of time to file

6   briefs in which it stated that it was not going to be granting

7   very many extensions in the future.  And it also said that the

8   usual time for court reporters to prepare transcripts is 30 days.

9        While some extra time is expected for a trial of this

10  length and complexity, a delay of over one year is unusual by any

11  stretch.  So this is another exceptional reason that the Court

12  can consider on its own or in combination with the other reasons

13  that qualifies Mr. Walker for release under Section 3145C.

14       There are other exceptional reasons that the Ninth

15  Circuit has cited to that also apply in this case, the -- whether

16  the criminal conduct was aberrational.  Mr. Walker has no

17  criminal history.  Whether Mr. Walker intended to harm anyone.

18  There is no evidence that there was that kind of intent.  And

19  that the nature of the crime that subjects him to the Mandatory

20  Detention Act is dissimilar to others that bring defendants

21  within that statute's purview.  In particular, that it is not a

22  crime of violence and it's not drug trafficking, indicating that

23  this is not the kind of crime that congress intended to have the

24  Mandatory Detention Act apply to.

25       All of these factors alone or in combination, qualify

1    as exceptional reasons why detention is not appropriate in this

2    case and because Mr. Walker has shown these exceptional reasons,

3    he is no longer subject to the Mandatory Detention Act.  So the

4    Court need not find that it would grant a motion for acquittal or

5    a new trial.  Instead, the Court need only find that he is not

6    likely to pose a risk of flight or a danger to the community,

7    just like any other defendant.  And the -- and that finding, we

8    think that Mr. Walker has made.  It's important to keep in mind

9    that the standard is not likely to flee or pose a danger.

10           Mr. Walker need not show that with absolute certainty

11   that it would be impossible for him to flee or -- and nor need he

12   prove that he is exceptionally less likely to flee than a typical

13   defendant.  He simply must show that he is not likely to.  And we

14   believe that he's made that showing with his exemplary

15   performance on pretrial release and more recently, in the

16   parallel civil case that the Government has filed, he has entered

17   into a consensual temporary restraining order, which we

18   anticipate will be strengthened into a preliminary injunction in

19   the near future.

20           And in that circumstance, the Government in that case,

21   in the civil case, expressed exactly the same concerns over

22   danger to the community that it expresses here.  And it said in

23   that case, what it needed to do to mitigate that danger to the

24   community was get this injunctive relief that it has now gotten.

25   And so the Government has succeeded in getting the mitigating

1  efforts that it needed to get to reduce or eliminate  Mr.

2  Walker's alleged danger to the community.

3          In addition, Mr. Walker has strong reasons not to flee.

4  He does have close family members.  He has a long term partner,

5  Rose Hansen.  He has a nephew who he helped raise and he was like

6  a son to him and he has a beautiful ranch in Missouri that has

7  been in his family for a very long time.  If he flees, he will

8  have no chance to reverse his convictions.  And we have already

9  identified strong arguments for appeal.  No defense to the

10  Government's forfeiture of his property and he violates the

11  injunctions he's already agreed to in the civil case.

12          It would be crazy for him to take off.  Mr. Walker was

13  released on minimal conditions before and during trial.  He was

14  allowed to travel freely throughout the United States and this

15  Court even allowed him to travel internationally.  Each and every

16  time, he justified the Court's faith in him by coming back to

17  court, returning, showing up to the probation office when he

18  needed to and coming to this court every single day.

19          The Court even released him after the guilty verdicts

20  were -- came in and he came back to this Court again.  So any

21  concern about flight or danger can be addressed by increasing the

22  very minimal conditions that Mr. Walker was on before.  The Court

23  can increase the amount of his bond.  The Court can order home

24  detention on Guam.  The Court can order electronic monitoring.

25  The Court can order daily reporting of the Probation Office.  I'm

1  sure that the probation officer may have other suggestions, but

2  there are certainly conditions that this Court can fashion that

3  would mitigate any perceived risk of flight or danger to the

4  community that may -- that the Court may find exists.

5        Mr. Walker has made a strong showing that he should not

6  be subject to the Mandatory Detention Act.  For that reason,

7  among others, his continued detention under that act is not

8  appropriate.  Therefore, he should be released pending

9  sentencing, unless he poses a likely risk of flight or danger to

10  the community.  But because he poses neither, the Court should

11  order him released pending sentencing in this matter.  Thank you.

12        THE COURT:  Okay.  Thank you.  I'm sorry.  Thank you

13  very much, Ms. Ault.

14        Okay.  Ms. Miller, are you going to be responding for

15  the Prosecution?

16        MS. MILLER:  Yes, Your Honor, I am.

17        THE COURT:  Okay.  You may proceed.

18        MS. MILLER:  Thank you, Your Honor.  Before any

19  exceptional circumstances analysis is undertaken in this matter,

20  Your Honor, the Defendant must meet the conditions of release set

21  forth in Section 3143(A)(1) and must demonstrate by clearing

22  convincing evidence that he is not likely to flee or pose a

23  danger to the safety of any other person or the community, if

24  released.

25        Mr. Walker has failed to do any of those things and he

1    cannot be released pending sentencing.  One of the arguments made

2    by Defense counsel is that Mr. Walker should not be under the

3    mandatory remand provision of the statute because Defense

4    believes that they could successfully argue against Count 10.

5           However, Defense's sole argument regarding Count 10 is

6    their argument that Mr. Gazetti could not have rendered the

7    opinion that he rendered that the Defendant's use of counterfeit

8    parts caused serious bodily injury and death, which Mr. Gazetti,

9    as an accident reconstruction expert, who this Court accepted as

10   an expert in this case, specifically testified under oath that

11   based on his review and analysis -- and as Your Honor remembers,

12   Mr. Gazetti did not only review all of the records in this case

13   that were seized from the Defendant, Mr. Walker, he also reviewed

14   all of the information that the NTSB had in its possession

15   regarding all of the accidents that Mr. Walker's helicopters were

16   involved in.

17          He also reviewed the testimony by other witnesses.  He

18   also reviewed the part that the Government contended and proved

19   to a jury of Mr. Walker's peers was a counterfeit part and was

20   the proximate cause for the accident which caused the death of

21   Mr. Santos.  Attached as Exhibit B to the Government's response

22   to this motion, the Government cited to the Court pages worth of

23   testimony, documentary evidence and physical evidence that

24   supported the jury's finding in Count 10.

25          It was not just the testimony of Mr. Gazetti.  The jury

heard testimony of other individuals, who talked about the

accident that killed Mr. Santos.  They actually saw the

counterfeit part that was being used by Mr. Walker on his

aircraft.  They saw what it could do when it failed and they

heard testimony from an aerospace engineer.  They heard testimony

from a person who was the manufacturer of the helicopters.  They

heard substantial testimony to support their verdict, Your Honor.

You've already made a decision that the Defendant is

not likely to be successful on appeal or in any post-trial

motions.  Now, courts have rejected the very argument being made

by Ms. Ault, which is that because the Defendant was ostensibly

on his best behavior during pretrial, therefore, he should not be

remanded post-trial after he was convicted.

First of all, Your Honor, the Defendant is a high risk

of flight.  Pretrial already found that he was a high risk of

flight and, Your Honor, if you look at the circumstances of this

case, he is a high risk of flight.  Number one, regardless of the

fact that he has a long term --

(Off the record from 9:03 a.m. to 9:09 a.m.)

THE COURT:  Okay.  We're back.  Technical difficulties

taken care of.  Go ahead, Ms. Miller.

MS. MILLER:  Thank you, Your Honor.

THE COURT:  Sorry about that.

THE DEPUTY:  Mic test.  Test one.  Test two.  Mic test.

Okay.  Ready, Your Honor.

1          THE COURT:  Okay.  Go ahead.  You may proceed.

2          MS. MILLER:  Yes, Your Honor.

3          THE COURT:  Let's try it again.  Go ahead.

4          MS. MILLER:  Yes.  Can you hear me, Your Honor?

5          THE COURT:  I can.  Thank you.

6          MS. MILLER:  Excellent.  Thank you.  So we were just

7    talking about likely to flee, the standard of likely to flee.

8          THE COURT:  Uh-huh.

9          MS. MILLER:  And what I stated, Your Honor, is that Mr.

10   Walker, although he may have a longtime girlfriend, he is

11   unmarried and he has no children.  The other thing, Your Honor,

12   is regardless of what counsel says about Mr. Walker's behavior

13   pretrial, which the Government does not agree that his pretrial

14   behavior was exemplary, Mr. Walker has now been convicted of over

15   100 felonies, including wire fraud to the tune of $400 million,

16   which subjects him to a sentence, even if you ignore Count 10, of

17   27 years.

18          And that's if you ignore every other count, which

19   counsel for the Defense has done so in filing this motion.  Not

20   only has Mr. Walker been convicted of 100 counts, but Hansen

21   Helicopters has been convicted of every count against it.  And

22   Mr. Walker has already conceded that Hansen Helicopters is his

23   alter ego through their stipulation for forfeiture.

24          In addition to that Your Honor, we're aware of

25   additional substantial assets that Mr. Walker has that make him

1   an extreme flight risk.  He has millions of dollars' worth of

2   real property.  He has millions of dollars of personal property,

3   including aircraft, boats, vehicles, trucks.  Mr. Walker has

4   hired, in addition to his original trial team, an additional

5   eight lawyers, many of whom are former DOJ AUSAs, like Ms. Ault,

6   to represent him, and many of whom are being paid substantial

7   funds to represent him.

8           As you recall Your Honor, G2898 page 16 shows that Mr.

9   Walker, after the IRS seized the funds to which he stipulated to

10  their forfeiture, he wrote a check of almost $5 million to

11  himself in order to preserve funds and moved all of his assets to

12  accounts so that the Government could not access those accounts.

13  Regardless of what Ms. Ault says about Mr. Walker being

14  cooperative in the civil action, he has not been, Your Honor.

15          He has produced no evidence in the civil action.  He

16  has produced nothing to prove that he is no longer operating any

17  of the aircraft anymore.  He has produced nothing to show that he

18  doesn't have an ownership interest in Pacific Spotters

19  Corporation, which is still operating the fraudulent scheme today

20  as we speak and he has produced nothing despite the Government's

21  request him to do so to agree to put all of his assets under

22  control of the Government until all of these issues are resolved.

23  He is hardly cooperating with the Government.  He has agreed to a

24  temporary restraint, but, Your Honor, he has not agreed to any

25  injunctive relief.

1           THE COURT:  Let me just ask you.

2           MS. MILLER:  The other --

3           THE COURT:  Hold on one second.  On the -- and I just

4    received this this morning, a status report.

5           MS. MILLER:  Yes, Your Honor.

6           THE COURT:  So it just indicates -- status report

7    coming in from the United States Attorney's Office, yourself, Ms.

8    Miller, that --

9           MS. MILLER:  Yes, Your Honor.

10          THE COURT:  -- Mr. Walker, on page 2, and over 40 of

11   his alter ego companies are in active and productive negotiations

12   with the United States on preliminary restraints and several of

13   the issues --

14          MS. MILLER:  Yes, Your Honor.

15          THE COURT:  -- have been resolved or narrowed.  And the

16   parties are working in good faith and are optimistic that

17   mutually accepted consent, preliminary restraints can be reached

18   in the upcoming weeks.  So with regard to the Defendant here, it

19   looks like he -- I mean, it appears that as of today that he is

20   working in good faith in resolving the civil issue with -- as it

21   relates to the restraints.

22          MS. MILLER:  Your Honor, he is in discussions with us.

23   He has still not done some very, very key things that the United

24   States needs in order to prevent there from being a harm to any

25   other individuals as a result of his fraudulent practice.

1        Number one, we have requested repeatedly to inspect the

2   helicopters that were being used by him in Guam and are now being

3   used by him in the Philippines and he has not allowed us to do

4   that.  Number two, we have asked for records to show exactly

5   where his assets are located.  He has not done that.  He has a

6   new lawyer team that is defending him in the civil action and

7   they keep pushing the ball down the road saying we may be able to

8   get you --

9        (Off the record at 9:16 a.m./On the record at 9:18 a.m.)

10       (Court and Clerk confer)

11            THE COURT:  All right.  So just know -- I'm sorry.

12   There's going to be a delay, if this keeps on happening.  It

13   really could be because of the power outage, honestly.  You know,

14   we had a -- I don't know if it an island-wide power outage.  Was

15   it this morning?  Was it island-wide?  I know it hit my village.

16            UNIDENTIFIED SPEAKER:  Mine went out.

17            THE COURT:  Everybody went out.  Did anybody not go

18   out?  Okay.  Looks like it was island-wide.  All right.  So it

19   might -- we might go in and out, but let's just try to go through

20   -- get through this.  I think we can do it.  So, I mean, I don't

21   think we need -- I don't want to continue this.  I think we need

22   to just continue.  I mean, I don't want to continue this another

23   day.  Let's just try to push through it today.  All right.

24            MS. MILLER:  Yes, Your Honor.

25            THE COURT:  Okay.  Go ahead.  I think we're ready to go

1  again, Ms. Miller.

2         MS. MILLER:  Yes, Your Honor.

3         THE COURT:  So you've indicated -- I think the last two

4  things you talked about was you've stated that the Defendant has

5  not allowed an inspection of certain aircrafts, both on Guam and

6  the Philippines and that he has not shown where his assets are

7  located.  And I'm --

8         MS. MILLER:  That is correct, Your Honor.

9         THE COURT:  And I'm going to assume that when you say

10 assets, those are the assets that you discussed earlier.  I'm not

11 sure --

12        MS. MILLER:  Yes, Your Honor.

13        THE COURT:  -- if it's just real property, aircraft

14 vehicles, trucks and what was the other one?

15        MS. MILLER:  Bank accounts, Your Honor.

16        THE COURT:  Oh, bank accounts.  Yeah.  Okay.  Go ahead.

17        MS. MILLER:  Yes, Your Honor.  So none of that

18 information has been provided to the Government.  And one of the

19 standards under this particular statutory provision is whether

20 the Defendant is a danger to others.  And in considering whether

21 the Defendant is a danger to others, 3142(c) specifically states

22 that the person who is out on release shall not commit a federal,

23 state or local crime during the period of release.  But we have

24 substantial evidence, Your Honor, that the Defendant has, in

25 fact, continued to commit federal crimes while on release, that

1    result directly in a danger to other individuals, specifically in

2    continuing to operate Pacific Spotters Corporation in the

3    Philippines.  There have been at least two accidents so far that

4    have involved helicopters that were leased by Pacific Spotters

5    Corporation.  There have been three accidents so far that have

6    occurred post-indictment, one of them during the last few weeks

7    of trial in which a pilot was killed and two mechanics were

8    substantially injured.

9         So, Your Honor, that becomes a very important

10   consideration for this Court, since the company is still

11   operating in the Philippines and the company is operating using

12   the same helicopters that they've been using previously.  And I

13   think one of the most important things for this Court to remember

14   about Mr. Walker and his activities is the following.

15        In 2016, after Mr. Walker learned that he was being

16   investigated criminally, he flew out to the Philippines and he

17   opened up a company called Pacific Spotters Corporation.  And we

18   saw that evidence in the trial as Exhibit G-3003.  In 2018, after

19   Mr. Walker was indicted, arraigned and put on pretrial released

20   with conditions, he transferred ownership of his helicopters to

21   this company that he had created called Pacific Spotters

22   Corporation.

23        Now this issue came up in trial, Your Honor, because

24   Exhibit 3003, page 21 shows that Mr. Walker presented himself to

25   a notary public in the Philippines in order to make that legal

1 transfer of those helicopters from himself to Pacific Spotters

2 Corporation.  Interestingly, during trial when this issue was

3 brought before the Court and what was also brought before the

4 court was that Mr. Walker did not have permission to travel in

5 November of 2018, where it shows that he actually presented his

6 passport to a notary in the Philippines.  Mr. Walker's attorney,

7 Mr. Martin, provided Mr. Walker's passport and said he did not

8 travel.

9          By doing so, Your Honor, he conceded that Mr. Walker

10 involved himself in a fraud with the notary public in the

11 Philippines in order to illegally transfer those helicopters into

12 the title of Pacific Spotters Corporation.  Since that time, Your

13 Honor, the Government has also spoken with and interviewed Mr.

14 Lirow, who was a party to that transfer of the helicopters.  And

15 Mr. Lirow, as you recall, Your Honor, from the civil status

16 hearing, is a lawyer himself.

17          THE COURT:  Uh-huh.

18          MS. MILLER:  And he said that Mr. Walker never appeared

19 in the Philippines and that he never appeared in front of a

20 notary.  He also said that that transfer of those helicopters to

21 Pacific Spotters Corporation was a sham.  Now, after much

22 argument and presentation of the evidence, this Court found that

23 Pacific Spotters Corporation was, in fact, an alter ego of John

24 Walker.  And you recorded that finding in Exhibit 7 -- not

25 exhibit -- in ECF 1704.

1          During the criminal case, the Defendant's own attorneys

2     introduced into evidence proof that Pacific Spotters Corporation

3     was operating using the same helicopters that were part of this

4     massive fraud.  Specifically, Your Honor, I refer you and the

5     Court to Exhibits Defense 115, Defense 123 and Defense 124.

6          We also know that Mr. Walker's partner in crime, Mr.

7     Crowe, received permission numerous times to fly to the

8     Philippines after notice of the criminal investigation, after the

9     criminal indictment, to continue the fraud in the Philippines.

10    And I refer Your Honor and the record to ECF 53,  ECF 161 in

11    November of 2018, where Mr. Lujan said Mr. Crowe needs to fly to

12    the Philippines to inspect a fleet of Hansen Helicopters and to

13    evaluate and train Hansen Helicopter pilots, who are working

14    aboard fishing vessels out of the Philippines.  ECF 259, in

15    August of 2019.

16         Hansen works with Pacific.Spotters Corporation, a

17    Philippines company that contracts with fishing vessels.  The

18    helicopters are used and it goes on to describe the exact same

19    fraud that Hansen Helicopters has been involved in.  It was just

20    moved over to the Philippines and Walker is still controlling

21    Pacific Spotters Corporation.  In March of 2020, Mr. Crowe again

22    went to the Philippines to oversee the operations of Pacific

23    Spotters.  This is almost two years after the indictment.  ECF

24    430.  "If I'm permitted to go to the Philippines, I would oversee

25    and supervise the work of approximately 15 full-time employees of

1  Pacific.Spotters."

2          April 2020.  ECF 448, same thing.  ECF 845, November

3  2020, same thing.  ECF 953, May of 2021, same thing.  June of

4  2021.  ECF 994.  "Mr. Crowe needs to direct and oversee the

5  activities of Pacific Spotters."  Evidence of the continuing

6  fraud, Your Honor, was filed by the United States.  And this

7  Court, after reviewing it, agreed that there was evidence of

8  ongoing fraud that was both relevant and admissible.  And I refer

9  the Court to ECFs 1376 and 1521.

10          That was in addition to this Court finding that there

11  was substantial evidence that Mr. Walker and Hansen Helicopters

12  committed tax fraud.  I refer the Court to Government's Exhibits

13  2940, 2941 and Special Agent Kombunksa's affidavit in support of

14  our civil action as well as his testimony at the criminal trial.

15  We know that Mr. Walker interacted with the Philippine

16  authorities using the same modus operandi that he did with the

17  FAA in the United States.

18          Exhibit G-378 shows a bribe paid to the Philippine

19  authorities from Mr. Walker's account in order to allow him to

20  continue to operate out of the Philippines.  Exhibit G-2990 are

21  leases that were entered into between Pacific Spotters and the

22  tuna boat companies after the indictment for the same exact

23  aircraft that were involved in a second superseding indictment in

24  this case.  Exhibit G-2939, Your Honor, shows that payment for

25  the use of those helicopters to Pacific Spotters Company was

1    deposited into the Limey Air bank account and Limey Air, as this

2    Court found in ECF 1704, was yet another Walker alter ego.  All

3    of these things were happening after Walker had been indicted

4    while Walker was on pretrial release.

5          Your Honor, if you recall the testimony of Mr. Marinho,

6    Mr. Marinho testified that in 2020, he was hired by Hansen

7    Helicopters two years after Hansen Helicopters was indicted along

8    with Mr. Walker.  He also produced and we admitted into evidence,

9    his contract with Hansen Helicopters, proof that he was not

10   certified by the FAA and proof through his testimony and exhibits

11   that even though he wasn't certified by the FAA, he was allowed

12   by Hansen Helicopters and Walker to fly not one, not two, but

13   three United States registered helicopters illegally until he

14   couldn't take it anymore and he actually abandoned the helicopter

15   because of the poor condition of the helicopter, including his

16   testimony that the tail rotor pitch change link, which Mr.

17   Gazetti said caused the accident that killed Mr. Santos, was

18   being held in place by a piece of fabric, because it was a

19   counterfeit part that didn't operate the way it should have.

20         Mr. Marinho testified that Pacific Spotters Corporation

21   was the corporation that was paying his salary to him.  Now,

22   after the conviction, Your Honor, the United States hired a

23   Philippine law firm and a Philippine investigator who actually

24   went to Pacific Spotters Corporation.  And when they went there,

25   they found evidence of the fact that Pacific Spotters was still

1    operating, the fact that Pacific Spotters was using the

2    helicopters that were used in the fraud in this case, photographs

3    of those helicopters that were being used and a recordation of

4    communications with people who work for Pacific spotters that

5    referred to Hansen Helicopters as the quote, mother company.

6            All of this is outlined in Mr. -- Special Agent

7    Kombunksa's affidavit in support of the civil case that was also

8    filed as Exhibit A in response to the Defendant's motion for

9    release.  We also have, Your Honor, evidence now that Mr. Walker

10   has transferred over a million dollars' worth of property to

11   someone for only $10.  Our contention is that that is a

12   fraudulent transfer, and again, a violation of law that he has

13   committed not only post indictment but post-conviction.

14           Just a few months ago, 12 helicopters that had been

15   deregistered from the US registry for supposed registration in

16   the Philippines were actually brought back to Guam from Pacific

17   Spotters.  Pacific Spotters sent these helicopters to Guam to

18   Hansen Helicopters with their US registration numbers in order

19   for those helicopters to be repaired and maintained by Hansen.

20   Sound familiar?  It should, because it's the same exact fraud

21   that has been going on and that is still going on today.  And

22   when we requested to inspect those helicopters in the civil case,

23   we were told no, you have to wait.  We identified all of those

24   helicopters as helicopters that were involved in the fraud, many

25   of which, Your Honor, are on the destroyed list of the

manufacturer, many of which are military helicopters, which have
never -- should never have been exported from the United States
in the first place, which is another violation of the criminal
laws.

Now, Ms. Ault said that Mr. Walker has stipulated to
forfeiture and he's being cooperative, but, Your Honor, in front
of you right now is pending a motion by Pacific Spotters
Corporation to return two helicopters to it that it is claiming
it legally properly owned.  And Your Honor, we are going to have
a hearing on that, but in anticipation of this argument, the
Government has already provided the Court with information about
those two helicopters.  Pacific Spotters Corporation is saying
that it is the rightful legal owner of two helicopters that are
still in possession of the Government.  Both of those helicopters
were part of the jury view.  Both of those helicopters had been
destroyed multiple times.  Both of those helicopters were seized
by the Government, because after they were involved in accidents,
Mr. Walker tried to destroy them.

The Government submitted in response to the renewed
motion for reconsideration of release a videotape, Your Honor,
showing the Defendant Walker, one of his helicopters, November
539, which was still operating with a US registration number
despite the fact that it was no longer registered in the US, was
pushed over the side of a fishing boat and allowed to sink, so
that no one could inspect that helicopter to determine the cause

1  of the accident.  And in the email communication between the boat

2  and Pacific Spotters and Hansen Helicopters, there's a reference

3  to the fact that this was an aircraft that was being leased

4  through Pacific Spotters by Hansen Helicopters.

5           A couple of other things have happened, Your Honor

6  since the conviction of Mr. Walker that have changed the status.

7  Number one.  Spares, Inc., has in fact pled guilty to

8  manufacturing multiple counterfeit parts and selling them to

9  Walker and Hansen Helicopters.  ECF 1947 is their amended guilty

10  plea, where they admitted that they sold almost a million

11  dollars' worth of counterfeit parts to Walker and Hansen

12  Helicopters to be used on these helicopters, including the

13  critical part that caused so much damage, death and injury, the

14  tail rotor pitch change link.

15           We know for a fact that $100,000 worth of counterfeit

16  parts were purchased by Walker and Hansen Helicopters after the

17  indictment.  They just never stopped.  And then during the trial,

18  at the very end of the trial, RPC 6911, which was being operated

19  by Pacific Spotters -- and we proved that through evidence that

20  Mr. McConwell introduced, D-123, was involved in a crash at

21  Pacific Spotters, where the pilot died and two mechanics had

22  serious bodily injury.

23           Thirty-eight total accidents, 10 deaths, 18 people with

24  serious bodily injury.  Walker has shown no remorse for any of

25  the deaths or injury.  He has accepted zero responsibility for

1   his crimes.  If you read the TRO, he's not admitting to anything.

2   He's just saying I promise not to violate the law anymore.  But

3   Your Honor, the evidence has shown and the jury has found that

4   Mr. Walker violated 100 different counts and Hansen Helicopters

5   multiple counts and there is no factual or legal basis to grant

6   this motion under the circumstances of this case.

7           Now, Ms. Ault said that, Your Honor, you don't have to

8   really worry about whether they would be successful on appeal or

9   not.  The issue really is only one of, is he a risk of flight?

10  That's not correct.  That's not the standard at all.  If you look

11  at the applicable case law, the standard is much more rigorous

12  than that.  First of all, citing United States Supreme Court

13  Cases, the Government, if you look specifically, Your Honor, at

14  page 13 of our response, it is clear that the verdict against Mr.

15  Walker should be given significant deference.

16          Secondly, when you apply the provisions of the statute

17  under which we're talking about today, based on the fact that the

18  jury found after the trial and accepting all of that evidence,

19  that that aircraft accident did, in fact -- was caused by the

20  tail rotor pitch change link and that did cause the death of Mr.

21  Santos.  That's it, it's a mandatory detention.  And this Court

22  already heard all of these arguments and already ruled such back

23  in September of last year.

24          So the question becomes, did anything change between

25  September of last year and now that creates these exceptional

circumstances?  Well, first Your Honor, the Defendant has to establish that there would be a particular injustice in keeping him in prison pending his sentencing.  And as Your Honor knows, even if Count 10 were removed, which the Government is not contending it should be, Mr. Walker would still be looking at 27 years just for the wire fraud violation.

So this isn't one of the cases cited by the Defendant, where it's possible that the Defendant will spend more time in jail waiting for his sentencing than he will after his sentencing.  He's pretty much going to spend the rest of his life in jail unless he is successful on an appeal.  And the Government's contention is that he will not be.

As the Supreme Court said, care must be taken to ensure that relief on account of this exceptional reasons  analysis doesn't emasculate Section 3143(a)(2).  Specifically in Bennett v. Spear 520 U.S. 154, page 173, the court said that the cardinal principle of statutory construction is to give effect to every clause and word of a statute, rather than to emasculate an entire section.  And the court also said it would be highly anomalous, indeed, if congress, having crafted such a narrow and specific exception to mandatory detention, permitted release under the more generous conditions under the guise of exceptional circumstances.  And this idea that because the court reporter didn't have the transcript ready sooner as an exceptional circumstance.

1    Well, Your Honor, if you recall, the Defendants moved

2  not once but twice to continue the sentencing because they

3  contended that they needed the entire transcript, which is

4  inconsistent with their argument right now that really all they

5  need is the transcript of Mr. Gazetti's testimony, which by the

6  way, Your Honor, they've had for months.

7    They have never filed any motion with you, Your Honor,

8  saying, Your Honor, we would like to have some sort of solution

9  besides waiting for the court reporter to finish the transcript.

10  They never filed anything like that.  They're the ones who kicked

11  the ball down the road over and over and over again.  I'm not

12  going to go through the cases cited in my response, Your Honor,

13  but the very arguments that Ms. Ault has made have been rejected

14  by numerous courts as not rising to the level of exceptional

15  circumstances.

16    Is Mr. Walker a flight risk?  Absolutely.  Why is he

17  more of a flight risk now than he was before?  Because he's been

18  convicted, because the cards are falling down around him.  One of

19  his co-Defendants has already pled guilty.  We're in discussions

20  with other co-Defendants for plea agreements right now, Your

21  Honor.  So the very things that he wants to rely on just don't

22  exist anymore. He has millions of dollars' worth of assets.  He

23  has no real ties to the community and there have been three

24  accidents so far since he created Pacific Spotters, one of which

25  has caused death and serious bodily injury.

1          There is zero evidence that Mr. Walker is going to stop

2  committing his crimes.  He's going to keep committing his crimes

3  because frankly, Your Honor, they're too lucrative to stop.  He's

4  still making all of that money with these leases.  We've had

5  several of his attorneys in the civil case specifically tell us,

6  even though they're representing other individuals, that Mr.

7  Walker is footing the bill for all of their representation.  He

8  has to continue to commit his fraud in order to fund his defense.

9          But what this Court should not do is release someone

10 who has been convicted of 100 felony counts and basically ignore

11 the jury's finding after they received and accepted all of that

12 evidence that Mr. Walker did, in fact commit all of these crimes,

13 that he did, in fact, cause death and serious bodily injury and

14 this honor -- Your Honor, your order that he should be remanded,

15 because there are not sufficient guarantees that he will present

16 himself at a later date for sentencing.

17         Under all of the circumstances, Your Honor.  We rely on

18 everything that we've filed.  We argue that the Government's --

19 the Court should not grant the Defendant's motion for release.

20 There are no exceptional circumstances.  There is no injustice to

21 Walker sitting in jail waiting for the sentencing, considering

22 all of the felony convictions against him.  Thank you, Your

23 Honor.

24         THE COURT:  Okay.  Thank you, Ms. Miller.  And Ms. Ault

25 or Ms. Martin?  Who's going to speak?

1      MS. AULT:  I'll take the first crack at it, Your Honor.

2  Let me ask Your Honor first if there's anything in particular

3  that I can be helpful to the Court with before I address all of

4  Ms. Miller's various arguments.  Is there anything in particular

5  the Court would like me to talk?

6      THE COURT:  Not at this time.  I just want to hear both

7  of your arguments.  I've read your -- I've read all of your

8  motions, replies and so forth.  I've read all of that, but I just

9  want to hear oral arguments first before I start asking any

10  questions.  But go ahead.

11      MS. AULT:  Certainly, Your Honor.  So first, the Court

12  has not heard these arguments before.  This is a different

13  statute than the Court considered before.  Before the Court

14  considered the Mandatory Detention Act, which is 3143(a)(2).

15  This is 3145(c).  It's a different standard.  In addition, there

16  are new facts that we are arguing, new facts that we have learned

17  about, the temporary restraining order and the preliminary

18  injunction, which are -- is about to be agreed to are substantial

19  new facts that did not exist before.

20      In addition, counsel was not aware of this issue with

21  Count 10 until we saw the transcript from Mr. Gazetti, in which

22  he did not actually testify that the accident caused the death,

23  as the Government had been claiming throughout trial that he was

24  going to do.

25      THE COURT:  Although they were here --

1           MS. AULT:  And --

2           THE COURT:  -- although the Defense counsels were here

3   during the trial.  They heard the testimony of Mr. Gazetti.  It's

4   not as if this is like --

5           MS. AULT:  They did.

6           THE COURT:  -- brand new counsel and they have no idea

7   what the evidence was during the trial.

8           MS. AULT:  They did, Your Honor, however, I would

9   submit that the end of the trial was very chaotic.  The Court

10  issued a ruling in which -- sanctioning Government counsel for

11  violating the Court's order, which substantially changed Mr.

12  Gazetti's testimony.  It is not unusual -- and I can tell the

13  Court this is an appellate lawyer with many years of experience.

14  It is not unusual for, especially at the end of trial, for -- in

15  the sort of chaos of what happens at the end, for trial counsel

16  to just miss some things.

17          And you know -- and that's fine.  Those are things that

18  happen and the rules are set up to account for that.  For

19  example, the error in the jury instructions.  Again, we have not

20  completed a complete analysis of it, but it clearly seems to fall

21  under the plain error doctrine.  It is an error that was plain.

22  There is a direct on point Supreme court case bridge, which the

23  Government does not contend doesn't apply here.  It clearly

24  applies here.  Under that case, the jury instruction was supposed

25  to include not only proximate causation but also but for

1    causation.  It did not include but for causation.  Mr. Gazetti

2    didn't testify about but for causation nor have -- did he have --

3    he was not proffered as an expert in the cause of death.  He did

4    not hold himself out to be an expert in the cause of death and

5    the Court didn't qualify him as an expert in the cause of death.

6          There was no coroner that was called at trial.  There

7    was no physician that was called at trial.  Nobody could testify

8    about what caused the death of the person in that accident.  And

9    without that causation evidence, that but for causation evidence,

10   there simply cannot be a conviction on the resulting in death

11   finding in Count 10.  The evidence wasn't there and the jury

12   instruction didn't properly instruct the jury.

13         So we do think that there is a -- and again, we don't

14   have to prove that right now.  We just have to make a substantial

15   challenge and that is a substantial challenge.  Other things that

16   Ms. Miller mentioned.  She says that Mr. Walker has no ties to

17   the community because he's not married and he has no children.

18   Your Honor, family comes in many forms.

19         Many people choose to live for decades, their whole

20   lives with someone without marrying them.  And simply because Mr.

21   Walker is not married to Ms. Hansen doesn't make their

22   relationship any less sincere or any more committed as

23   demonstrated by Ms. Hansen's daily attendance at the trial in

24   this case.  And simply because Mr. Walker's nephew is not his

25   biological son, doesn't mean that Mr. Walker's relationship with

1   him is not akin to the relationship of a father and son.  Mr.

2   Walker helped to raise his nephew after his brother's untimely

3   death.

4           And so Mr. Walker does have substantial ties.  He does

5   have family that would be devastated if he were to disappear

6   forever.  Also, it is -- the idea that Mr. Walker has hired

7   counsel to defend him in this case and that that somehow should

8   be held against him is -- has no place in this hearing.  Mr.

9   Walker is entitled under the Sixth Amendment to be represented.

10  He is entitled to be as represented as vigorously as he can be

11  and to intimate otherwise is to take issue with the constitution,

12  quite frankly.

13          THE COURT:  Well, don't worry about that.  I would

14  agree with you.  I mean, I think that no matter how wealthy or

15  not so wealthy Mr. Walker might be, he is entitled to use his

16  money the way he wishes to defend himself.  So that won't be held

17  against him, if he decides to get a team, a huge team of lawyers

18  to represent.  This is a very important case for him and for the

19  Government.  It's 100 count -- over 100 count indictment and so

20  the Court understands your argument, so you may proceed.  Don't

21  worry about that.  I'm not going to hold that against him.

22          MS. AULT:  Thank you, Your Honor.

23          THE COURT:  No.

24          MS. AULT:  Thank you, Your Honor.  It's nice to know it

25  won't be held against my client.

1          THE COURT:  No.

2          MS. AULT:  And as for this litany of supposedly ongoing

3    criminal conduct that Ms. Miller has referred to, this is all

4    stuff that was outlined in the Kombunksa affidavit, as Ms. Miller

5    stated, all of it in the Kombunksa affidavit.  That is the same

6    affidavit that was filed in the civil case.  And again, as Your

7    Honor pointed out, the Government in the civil case has told this

8    Court and told us, quite frankly, that everything is proceeding

9    well, in that case, that the parties are proceeding through

10   negotiations, that we expect to be able to resolve everything

11   amicably.

12          When the Government raises issues, such as who owns

13   what helicopters, what helicopters were transferred where, we are

14   working with the Government or the civil attorneys, we're working

15   with the Government to come up with the answers to their

16   questions and to figure out, more importantly, what precise

17   information they want to know.

18          THE COURT:  Well, do you think it --

19          MS. AULT:  So that's one --

20          THE COURT:  Let me just ask you.  Sorry to interrupt.

21   But do you think it's premature for you to be making these

22   arguments, if you are still talking about where his assets are

23   located, where -- whether there will be an allowance of

24   inspection of aircraft?  I mean, if you're still talking about

25   these major issues that even our Pretrial Officers or -- well,

1  no.  It's not -- I mean, the officers from Probation and Pretrial

2  would look at as we fashion conditions of release, those are

3  major issues that the Court would want to know.

4       And if it sounds like the prosecutor is concerned about

5  these assets, which will impact on his danger to the community

6  possibly and clearly for flight risk, then maybe this is

7  premature to be arguing at this point.  And then you might want

8  to go back and discuss these issues before you come into court

9  and really try to push for a Court's determination that there is

10 clear and convincing evidence that would demonstrate that he's

11 not a flight risk nor a danger to the community.

12       MR. MARTIN:  May I respond to that briefly, Your Honor?

13       THE COURT:  Sure.

14       MR. MARTIN:  This is Mr. martin.

15       THE COURT:  Yeah.

16       MR. MARTIN:  I've been representing Mr. Walker since

17 2017, and since the conviction, not one representative of the

18 Government has reached out to me and asked me to inspect

19 anything.  And for the representation to be made to you --

20       THE COURT:  Uh-huh.

21       MR. MARTIN:  -- Mr. Walker has attempted to block

22 inspections of helicopter is ludicrous and offensive to me

23 because I'm his lawyer.  They can't talk to him.  They have a

24 record of everything he's ever said or done because he can't talk

25 to anyone on the telephone from the prison without them having a

1  record of it.  They inspect every letter he writes.  They know

2  who he talks to and they are trying to say he's doing all these

3  things.  He's in custody.  They have access to everything he

4  does.

5          THE COURT:  Okay.

6          MR. MARTIN:  And I'm a little bit offended by these

7  statements that he's denying them access to inspect helicopters

8  when he's in prison and (indiscernible - Ms. Miller speaking over

9  Mr. Martin)

10          MS. MILLER:  Your Honor, may I respond, please,

11  because --

12          THE COURT:  Hold on.  Hold on, Ms. Miller.  Let him

13  finish.  Let him finish.  Hold on.

14          MR. MARTIN:  Well, but he's -- he doesn't --

15          THE COURT:  Ms. -- I know.  Hold on.  Okay.  Let him

16  just finish.

17          MS. MILLER:  Okay.

18          THE COURT:  Let him finish --

19          MS. MILLER:  Okay.

20          THE COURT:  -- his argument.  Let's be respectful.

21          MS. MILLER:  That's fine.

22          MR. MARTIN:  Your Honor, I'm his --

23          THE COURT:  Go ahead.

24          MR. MARTIN:  The concern is I am his counsel.  If they

25  want something from him, they reach out to me.  That has not

1    occurred and for them to represent that they've asked him

2    repeatedly to inspect helicopters is an absolute falsehood and I

3    object to it.

4            THE COURT:  What about the -- okay.  So besides the

5    inspection issue, what about the assets issue?  I mean, the

6    Prosecution has made that statement or representation to the

7    Court, and I hear Ms. Ault indicating that it appears -- and I

8    I'm not sure.  She can -- you guys can correct me if I'm wrong,

9    but it appears that you're still in the -- you are all still in

10   the process of discussing that particular issue of asset

11   location.

12           MS. AULT:  We're --

13           MR. MARTIN:  In the criminal case, Your -- I'm sorry.

14   I didn't mean to interrupt you, Your Honor.  In the criminal

15   case --

16           MS. AULT:  And I apologize.

17           MR. MARTIN:  -- Your Honor, no one has reached out to

18   me on any of these issues.  Now I understand the TRO and there's

19   discussions going on, and there are other lawyers involved in

20   those, and they can't -- right now, they can't access -- they

21   have no access to what's going on in court.  I've gotten several

22   texts what's going on from other lawyers, because apparently

23   technical difficulties are preventing them from hearing and they

24   are involved in those types of discussions, but I can't

25   communicate with them right now, and because of the technical

1   difficulties y'all are having there.  But I know from

2   representing Mr. Walker since 2017, things she's represented that

3   -- requesting assets, none of that's a part as to me.

4           MS. AULT:  And Your Honor --

5           THE COURT:  Okay.

6           MS. AULT:  -- with respect to the --

7           THE COURT:  Yes.

8           MS. AULT:  -- the negotiations in the civil case, my

9   understanding from talking to the civil lawyers is that the issue

10  isn't that Mr. Walker has denied them any information or anything

11  that they've wanted.  The issue is that the party is just -- the

12  Government hasn't told us yet what they want.  And it's, you

13  know, the usual kind of thing when you do a negotiation.

14          The Government says we want XX and we say, well, does X

15  mean X, Y and Z or does X just mean X and Y?  And they say, oh, X

16  just means X and Y.  We didn't really want Z.  And that is the

17  kind of negotiation that's going on.  It is not at all that Mr.

18  Walker is hiding anything or denying anything or telling the

19  Government that they can't have anything.  It's just that the

20  parties are, as the Government has said, working through these

21  issues amicably.

22          And if that is a sticking point for Your Honor,

23  certainly we will go back and finish those negotiations and then

24  come back to Your Honor.  But we don't think that it's necessary

25  because those issues are not tied to whether he is a risk of

1   flight or a danger to the community, because the question

2   becomes, how would Mr. Walker flee?  Mr. Walker, if he is subject

3   to electronic monitoring and home confinement and daily reporting

4   to the probation officer, there's simply no way for him to take

5   off.

6           And again, the standard is not that it has to be

7   absolutely impossible for him to flee.  It is that it has to be

8   not likely to flee.  And again, we submit that Mr. Walker, having

9   been released on very minimal conditions -- and usually the way

10  this works is if he's on minimal conditions, then the Court

11  strengthens those conditions and strengthen those conditions.

12  And it's only after Mr. Walker has violated many, many times that

13  the Court would then remand him.

14          In this case, the Court went from zero to 100 all at

15  once.  And so we're simply asking the Court to take a step back

16  and say in this case, there are fact -- Mr. Walker isn't a

17  serious risk of flight, he isn't a danger to the community or at

18  least he's not likely to be.  And it's just that standard he's

19  not likely to be.  And it's only a little bit different than the

20  standard pretrial, because all that changed is going from a

21  preponderance of evidence to clear and convincing evidence the

22  burden has shifted.  But that's it.

23          THE COURT:  But that's a higher burden, the standard of

24  clear and convincing evidence.  You would have to --

25          MS. AULT:  But it's not beyond a reasonable doubt, Your

1   Honor.

2           THE COURT:  That's true.

3           MS. AULT:  It's clear and convincing evidence.

4           THE COURT:  Right.  So you would have to show by

5   clearing convincing evidence that he's not likely to flee and his

6   -- I mean, clearly his asset, possessions, whatever he has in his

7   asset location, I mean, those are something that the Court would

8   look at very carefully and especially after -- especially because

9   he has been convicted of close to 100 counts.  I can't remember

10  if it's 98 counts or -- you know, he's been convicted of a lot of

11  counts.  And even if you were to take away the Count 10, I mean,

12  the Prosecution does make a point.  He still has those other

13  counts that are there.  The jury has found him guilty of those.

14          MS. AULT:  Yes, Your Honor.  And once we have the

15  transcripts -- and again, we really need those transcripts to

16  make the post-trial arguments to the Court.  I think it's

17  disingenuous for the Government to say that we are somehow

18  putting things off.  We -- trust me.  We would love to have the

19  information that we need to make those arguments.  But, we simply

20  can't without knowing exactly what the testimony was at trial.

21  But we do -- we have already identified.

22          THE COURT:  Well, you guys have -- as I know and I did

23  speak to my court reporter before this hearing, and you have

24  received a substantial amount of the transcripts already.  I do

25  know that.

1          MR. MARTIN:  We've received four, Your Honor.

2          THE COURT:  Yeah.  But I think it's over --

3          MR. MARTIN:  Of 18.

4          THE COURT:  -- over 50 percent of the trial, I think,

5    if I'm not mistaken.  That's what she had indicated to me.  So

6    you have received a substantial portion --

7          MR. MARTIN:  I don't --

8          THE COURT:  -- of the trial proceedings.  Anyway, go

9    ahead.

10         MR. MARTIN:  Your Honor, in light of that, you know,

11   Mr. Gazetti's testimony never -- nobody's testimony linked a

12   counterfeit part, as the Government calls him (sic) to the -- Mr.

13   Santos' helicopter.  There was no evidence presented through

14   Gazetti or any witness that that helicopter even had a

15   counterfeit part on it.  And as Ms. Ault said, there's no

16   evidence what caused that helicopter even to wreck.  Mr. Gazetti

17   read from the NTSB report that they couldn't determine the cause,

18   but he was able to bootstrap in his own personal opinion that it

19   was caused by the pitch change link, but it's not supported by

20   anything.

21         So I remember the evidence very clearly and for the

22   representation that they proved that there's no witness ever did

23   that.  And so, I -- you know, we've got that and if -- we've seen

24   the transcript and we know it's not in there.

25         THE COURT:  Okay.  Well --

1          MR. MARTIN:  Go ahead.  I didn't mean to interrupt you.

2     I just wanted to point that one thing out.

3          THE COURT:  No, I mean, you know, you're focusing on

4     Mr. Gazetti's testimony and there was more than Mr. Gazetti's

5     testimony during the -- I mean, if you look at the totality of

6     the trial, there was more than his testimony presented regarding

7     that link.

8          MR. MARTIN:  And I --

9          THE COURT:  Go ahead.

10          MR. MARTIN:  I agree with that, Your Honor, but no one

11     witness, no one witness or no totality of witnesses put a

12     counterfeit part on Mr. Santos' helicopter.  But -- and I

13     apologize.  I jumped in front of Ms. Ault, Your Honor, and I'll

14     let her continue to argue.

15          THE COURT:  Well, you -- and let me just ask you with

16     regard to the but for causation standard for Count 10.  As I

17     understand it, with regard to the jury instructions, none were

18     objected by the Court as to Count 10.  Is that -- do you recall

19     that, Mr. Martin?

20          MR. MARTIN:  Your Honor, I don't have the transcripts

21     and I know I objected to a lot of stuff, but I can't represent to

22     the Court, as an officer, exactly what I represented --

23          THE COURT:  Okay.  Let's assume --

24          MR. MARTIN:  -- what I objected to.

25          THE COURT:  Okay.  Let's assume that it's true that

1   there was no objection.  Of course, the plain error standard
2   would be the more -- the higher standard that you would have to
3   overcome at the -- at the appellate level.

4           All right.  Okay.  So any other argument? That was one
5   of the issues -- I mean, that is a concern that I have with
6   regard to the Prosecution indicating that they are concerned
7   about the asset location and the inspection issue.  And I've
8   heard what the -- what the Defense has indicated.  Do you have
9   any other arguments --

10          MS. MILLER:  Yes --

11          THE COURT:  -- Ms. Ault or Mr. Martin?

12          MS. MILLER:  -- I do.  Oh, I'm sorry.

13          THE COURT:  Mr. -- yeah, Ms. Ault or Mr. Martin, before
14  I hear from Ms. Marie Miller.  Go ahead.  Yes, Ms. Ault.

15          MS. AULT:  Certainly, Your Honor.  And I just wanted to
16  be clear that there was no request to inspect assets that Mr.
17  Walker denied.  So that's -- that is my understanding.

18          THE COURT:  Okay.

19          MS. AULT:  And you know, perhaps we misunderstood a
20  request that the Government made, but there certainly wasn't an
21  intentional -- an intent to deny that request.  And as far as
22  asset locations, we -- and information about accounts and things
23  like that we, you know, are happy to provide that information to
24  the Probation Officer or -- you know, to the extent that it would
25  ease the Court's concerns.

1    But I simply go back to the fact that that the issue is

2  not likely to flee or pose a danger to the community and given

3  Mr. Walker's agreements in the civil case in which the Government

4  has said over and over again that, you know, he's been nothing

5  but cooperative.  They have gotten everything that they've wanted

6  so far.  The only reason the preliminary injunction hasn't been

7  entered into is partly because the Government was spending its

8  time on other things.

9    And, you know, we have been patiently waiting, you

10  know.  For a while, we were patiently waiting for them to get

11  back to us.  So, if the Court -- at the end of the day, if the

12  Court believes that this is premature -- and we don't believe

13  that it is.  We believe that Mr. Walker has met his burden of

14  clear and convincing evidence -- that the Court will give us a

15  chance to come back again after we have reached an agreement with

16  the Government in the civil case.

17    THE COURT:  Okay.  Ms. Miller.  Or Mr. Martin, do you

18  want to add anything --

19    MS. MILLER:  Yes, Your Honor.

20    THE COURT:  -- before Ms. Miller speaks?

21    MR. MARTIN:  Your Honor, no.  Thank you, though, for

22  the opportunity.

23    THE COURT:  Okay.  Yes.  Ms. Miller.

24    MS. MILLER:  I'm going to cite to what the Government

25  asked for from the very inception of the civil case until now,

because what Mr. Martin represented was completely false. "Order Walker to divest any interest, direct or indirect he has in each of the alter ego Defendants, including the assets used to commit or facilitate the commission of the aircraft parts fraud for which he was convicted."

That request is in our complaint and our motion for a preliminary order injunction -- for preliminary injunction. That request was contained in the draft injunctions that we sent to Mr. Walker. I don't even know why Ms. Ault is addressing it, because she's not counsel of record in the civil case. And Mr. Martin, when we first filed the civil case -- and I asked him if he would accept service on behalf of Mr. Walker, he said, no. I'm not a civil lawyer. I'm not going to be involved in the case. So he missed the first bunch of discussions that were made regarding this.

We also asked for Mr. Walker to provide original registration and airworthiness certificates for all of the aircraft that are being utilized. We asked him to submit for prompt inspection by the FAA or any expert deemed qualified by the FAA, any aircraft part or aircraft in his possession or control. We asked for him to submit for prompt inspection by the FAA all maintenance records pertaining to the maintenance of each aircraft. We asked him for, Your Honor, pages worth of things that we have gotten none of these things provided to us in the civil case.

1        And as I said, from the very first filing until the
2   very last filing, we have provided and listed all of the things
3   that we expect and want from Mr. Walker, and he has not given us
4   any.  And, Your Honor, I would refer you to case number
5   123-CV-0002, because from document one through the filing of our
6   status report, you will see all of the times in which the
7   Government made those requests.  And if counsel who are in the
8   hearing tonight are completely unaware of these requests and this
9   is a big surprise for them, I don't know what to say about that
10  other than shame on them.

11       Now, this standard here is not just, hey, Your Honor,
12  we want to let you know, we don't think he's a risk of flight,
13  Your Honor because he's got a steady girlfriend and because he
14  says he's cooperating.  Well, Your Honor, maybe he's saying he's
15  cooperating and all of these lawyers are saying, wait Government
16  -- because it's not the Government that is delaying anything.
17  Maybe they're saying, wait, we will cooperate and maybe this is
18  all to get Mr. Walker out of confinement, so that he could take
19  the money, the assets, the aircraft that he still owns and has
20  and flee and we would have no way of having him answer to these
21  egregious crimes.

22       And this may not be, as Ms. Ault said, a case of
23  violence or drugs, but to the families who lost the ten
24  individuals who died because Mr. Walker was so greedy that he
25  wouldn't use aircraft that were actually safe, I would say that

1   to them, this is a case involving violence and death and it is

2   egregious.  $400 million fraud and he is still committing it.

3          And you know what, Your Honor, if he provides us with

4   every single thing that we have asked for in this civil case and

5   Ms. Ault and Mr. Martin come back to the Government and say, here

6   you go, you have every single thing that you asked for in this

7   civil case.  You can inspect these aircraft.  You've shut down

8   the operations.  We've brought all of the assets in.  He's got

9   nothing.

10          I bet you I would be in agreement with the fact that

11  there could be some way that he could be out pending sentencing,

12  because if we had wrapped all that up, then I wouldn't be

13  concerned about it.  But what they're saying is, hey, we haven't

14  wrapped all that up, but, you know, we're talking a good game in

15  the civil case, so let's just move on.

16          The standard is clear on convincing evidence.  Are you

17  convinced, Your Honor, that this man is number one, not a flight

18  risk; and, number two, is not going to continue committing this

19  fraud and putting others at risk?  And unless you are, this

20  motion should be denied.

21          THE COURT:  With regard -- Ms. Miller, with regard to

22  your argument that there -- you know, this has been -- you've

23  alleged that this has been a $400 million fraud and that the

24  Defendant is still committing fraud even up to this day, that's

25  what you're representing to the Court.  And I suppose you're --

1    and you're focusing on Pacific Spotters; is that correct?

2         MS. MILLER:  That is correct Your Honor.

3         THE COURT:  That's the allegation that the -- is that

4    the only allegation or is that the sole allegation with regard to

5    the ongoing fraud?

6         MS. MILLER:  The ongoing fraud is being done through

7    Pacific Spotters, Your Honor.  We've also submitted to this

8    Court, the fact that the Defendant only has a handful of

9    helicopters that are legally registered in the Philippines.  He

10   has none that are registered in the United States, yet he has

11   many leases through Pacific Spotters for these helicopters.

12        So our contention is that he is operating helicopters

13   that are not registered anywhere.  And that's why one of the

14   things we asked for were the proof of registration and proof of

15   airworthiness for all of the helicopters that have been involved

16   in the fraud.  And we provided the Defendants with a list of all

17   those helicopters as well as the list of all the information that

18   we want and need in order to assure ourselves that Mr. Walker and

19   his company is not putting anyone at risk.  But yes, he's still

20   operating through Pacific Spotters.

21        THE COURT:  So let's assume that's true.  I mean,

22   you're -- I mean, you're making this allegation and you've asked

23   the -- apparently asked the Defense counsel to answer to this.

24   It seems that that would definitely be something that our U.S.

25   Probation and Pretrial Officer would come back to the Court and

say, look, we might have a problem, because there are no known

conditions of release that can mitigate any issues of continuing

additional business or operating additional business with --

through Pacific Spotters as we speak.  I mean, that is a concern

the Court has, I will say Ms. Ault and Mr. Martin.

MR. MARTIN:  Your Honor, may I respond briefly?

THE COURT:  Yeah.  Well, that's one concern, but go

ahead.

MR. MARTIN:  The problem we have here is Ms. Miller is

talking about discussions that have happened with counsel that

are not even in this hearing.  These haven't occurred with me.

They haven't occurred with Ms. Ault.  I know from the -- I've

gotten a couple of emails on my cell phone --

THE COURT:  Okay.

MR. MARTIN:  -- that your public site on Zoom is not

working and the lawyers have asked what's going on and we can't

inform them --

THE COURT:  Oh.

MR. MARTIN:  -- and they don't have a clue what we're

arguing here and I can't respond to them because I'm not even a

party to those.  But from the criminal case that I'm involved in,

the representations that have been made are not accurate.

Now, I don't know about the civil case, Your Honor.  I

am one of the lawyers that have been involved in -- and with an

entry of appearance, but I've not been involved in any of these

1  discussions.  So I think the problem we have is, I can't respond

2  to those.  But I do know that from our standpoint, there have

3  been discussions and you've seen status reports that say that

4  they are making progress and there are good faith negotiations

5  going on.  The Government knows Mr. Walker is in custody.  He

6  can't be running Pacific Spotters, but somehow or another, they

7  magically seem to think that he is because if they had evidence

8  that he had a phone call or he's written a letter, you would hear

9  it.  You would hear it and Ms. Ault and I would have to respond

10  to that, but you have not heard that.

11        He's been in custody since September of 2022, and they

12  have not one scintilla of evidence that he has communicated with

13  anyone from Pacific Spotters or -- by either mail or by

14  telephone.

15        THE COURT:  Okay.  Let me just --

16        MR. MARTIN:  And I guess before -- if you need that

17  information, I would like to get the other counsel involved and

18  we're not able to because of the issues with your -- I

19  guess -- I didn't realize y'all had a power outage this morning.

20        THE COURT:  No, I -- that's not the reason why we don't

21  have public Zoom.  It's because, you know, under the Federal

22  Rules, after COVID and, you know, we had that whole issue with

23  COVID.  So they were allowing the Courts, the Federal Courts, to

24  have public access.  And now they -- that has expired, so we're

25  not able to do that now.  We don't do that.  And that's just --

1  you know, that's just the way the law is.

2         Congress allowed that previously because of our -- you

3  know, because of the pandemic, but now we're back to regular

4  court proceedings and the only time that we're able to allow Zoom

5  is if the attorneys are asking for it, which you are, because

6  you're off-Island.  But they -- pretty much everybody has to be

7  back in person.

8         And the only other way that it becomes -- the only

9  other way, I think, as I recall under my general order is that --

10 bankruptcy proceedings are allowed to have public Zoom.  So there

11 is no public Zooms for this type of hearing, because this is a

12 criminal case.  Just an FYI.  I didn't know if you knew that.  So

13 the -- I guess the issue then is we have a team of lawyers that

14 appears has been indicated for Mr. Walker that's handling the

15 criminal appeal, the reconsideration motion, the motion for

16 release.  And then another -- possibly another team, it sounds,

17 like that's handling the restraining order, the preliminary

18 injunction, final, permanent injunction.  Is that correct Mr.

19 Martin?

20        MR. MARTIN:  That's correct, Your Honor.  And although

21 we communicate, I don't know everything they're doing and they

22 don't know everything we're doing.

23        THE COURT:  Well, okay.  So that's not good that the

24 right doesn't know what the left is doing, because let me just

25 say that you both -- both Prosecution and both Defense are using

1    activity that is occurring in the civil action to buttress their

2    arguments for release or for detention.  I mean, so it's -- you

3    know what I mean?  I mean, it just -- it's unfortunate, but it

4    sounds like you need to communicate before you come into court

5    and we need to update -- hold on one second.

6              MS. AULT:  Your Honor?

7              THE COURT:  Oh, yes.  Anybody?  Yeah.  Go ahead.

8              MS. AULT:  Yes.  I'm sorry.  If I could just clarify a

9    couple of things?

10             THE COURT:  Yeah.  Go ahead.

11             MS. AULT:  Yes.  First --

12             THE COURT:  And so let me just say if -- okay.  Because

13   I don't know who the -- who all the parties are, who all the --

14   I'm sorry.  I know who the parties are, but I don't know who all

15   the lawyers are working back and forth or separately or

16   individually, however.  I'm not sure who the teams are, who --

17   anyway.  That's really your decisions.  But, anyway, just -- I

18   mean, just listening to this, and, I mean, just fleshing out all

19   the arguments and listening to all of you.

20             And, you know, Mr. Martin says, well, I don't know

21   this.  I have lawyers that are wanting to come on Zoom.  Are they

22   allowed to, like, listen in, Walter?  I mean -- yeah.

23   I think they are, right?  Can we or no?  Not really?  On the

24   public -- I can't remember for -- I don't think the -- I don't

25   think that they can do it for video, but I'm not sure, I don't

1   know about audio.

2          All right.  Anyway, so I'm -- I guess, Mr. Martin and

3   Ms. Ault, there just seems to be a -- I don't -- I'm not trying

4   to say miscommunication, but maybe lack of communication with

5   regard to what --

6          MS. AULT:  And Your Honor, if I --

7          THE COURT:  -- the left is doing and what the right

8   hand is doing.  Yes.  Ms. Ault, go ahead.

9          MS. AULT:  If I could address that, Your Honor?

10         THE COURT:  Yeah.

11         MS. AULT:  I actually did receive a detailed briefing

12  from the civil lawyers in the civil case before this hearing

13  after --

14         THE COURT:  Okay.

15         MS. AULT:  -- their last negotiation with the

16  Government.  And so if I understand Ms. Miller correctly, what

17  she is saying is that through the complaint and the motion for

18  preliminary injunction in the civil case, that she's considering

19  that to be her request for information and that to be her demand

20  to inspect helicopters and that by negotiating with the

21  Government in good faith, somehow, Mr. Walker is refusing those

22  requests.

23         And we would simply submit that that is just

24  negotiating with the Government over and asking questions like

25  what exactly do you want?  How far do you want to go back?  Where

1    -- you know, what records do we need to search?  Those things are

2    just part of the reasonable negotiation process.

3           THE COURT:  Yeah.

4           MS. AULT:  Those aren't denying the Government the

5    information that they're requesting.  And so if that's what Ms.

6    Miller was saying and that's what I understood her to be saying,

7    I don't think that that's appropriate.  Second -- and I apologize

8    for having to do this, but I really can't let Ms. Miller's

9    accusation that I and my counsel are somehow conspiring with the

10   Defense, with Mr. Walker to do something nefarious in the civil

11   case to get him released in this case.

12          I think that's inappropriate for her to accuse her

13   (sic) of that, and I can't let that go by without saying that's

14   absolutely not the case.  We are officers of the Court, and we

15   are absolutely acting as officers of the Court and making all of

16   our arguments in good faith.

17          THE COURT:  Well, let me --

18          MS. AULT:  And then with respect to --

19          THE COURT:  Let me just assure you.  Hold on, Ms. Ault,

20   because I know what it's like to be accused of certain matters,

21   having been a former litigator before I became -- came on the

22   bench, but the Court doesn't see that.  I don't see either

23   yourself or Mr. Martin trying to conspire to do anything

24   nefarious with your client, so don't worry about that.

25          MS. AULT:  Thank you, Your Honor.  I do appreciate you

1 | acknowledging that.

2 | THE COURT: Okay.

3 | MS. AULT: And then with respect to Pacific Spotters,

4 | as the Court has correctly pointed out, that is the evidence of

5 | the ongoing fraud. It all has to do with Pacific Spotters and

6 | the Government has -- as Mr. Martin points out, the Government

7 | has come up with zero evidence that Mr. Walker is controlling

8 | Pacific Spotters, even -- although they repeatedly make that

9 | claim. And I hate to keep referring to the civil case, again,

10 | but in the civil case, they treat it very differently. In the

11 | civil case, they treat Pacific Spotters and Mr. Walker as

12 | separate entities, which is what they are.

13 | And so for them to then come into this proceeding and

14 | act differently and claim that somehow they're one and the same

15 | is, again, a bit disingenuous. And you know, we have pointed out

16 | that Mr. Walker resigned his management positions and resigned

17 | from the board of Pacific Spotters months ago at the beginning of

18 | the year, that he is a minority shareholder in the company. But

19 | -- and as demonstrated with how the company is acting in the

20 | civil case, he doesn't have anything to do with what they're

21 | doing, at least -- and so -- and as Mr. Martin pointed out, like

22 | he couldn't from sitting in jail, so he has the position of any

23 | minority shareholder, which is that the company is doing what the

24 | company is doing and he is a minority shareholder. And he has --

25 | well, I'll leave it at that.

1          THE COURT:  Okay.  All right.  Ms. Miller.

2          MS. MILLER:  Yes, Your Honor.  Just a few things.

3   First of all, I talked about Mr. Walker playing the Government

4   and Mr. Walker playing the Court.  I didn't talk about counsel

5   participating in some illegal nefarious action.  That's the first

6   thing.  The second thing is even though Mr. Walker ostensibly

7   withdrew from his officer and director position of Pacific

8   Spotters, he did not withdraw from his position as being the

9   accountability manager of Pacific Spotters, which puts him

10  directly responsible for the condition of all of the helicopters.

11         We also know through an admission by one of the

12  attorneys in the civil case that Mr. Walker is still an owner.

13  He is not a minority owner.  He owns the biggest share of Pacific

14  Spotters.  We contended in our civil action and we contend in

15  this case that the other individuals who ostensibly own and are

16  officers of Pacific Spotters are mechanics, a mechanic's wife,

17  one of Mr. Walker's managers.

18         He put people who were Philippine citizens in positions

19  of ownership and as directors because under Philippine law, Mr.

20  Walker cannot be more than a 32 percent owner of the company.  So

21  he made himself initially his typical 90 plus percent owner of

22  the company and then he changed it to 32, because we have records

23  from the Philippine Civil Aviation Authority and the Securities

24  and Exchange Commission saying you cannot as an American citizen,

25  be a majority owner.

1             So he said, okay, and he put all of these other

2    individuals, who work for him, who are paid by him, in positions

3    of supposed power.  But when those people were asked who controls

4    and runs you, their answer was Hansen Helicopters.  Who owns and

5    controls Hansen Helicopters?  John Walker.  How he's doing it?  I

6    don't know.  That he's doing it, absolutely.  Because where's the

7    $20 million a year coming in for those leases with those

8    helicopters going to?

9             It's not going to the Philippine mechanics and their

10   wives who have -- who are officers and directors of that company,

11   Your Honor.  It's going to pay all of these lawyers defending Mr.

12   Walker.  He is still in control.  I don't have the burden of

13   proof.  Ms. Ault says, well, Ms. Miller can -- no, I don't have

14   the burden of proof here.  She does by clear and convincing

15   evidence and they have not brought that in.

16            The only reason why Pacific Spotters and John Walker

17   are being treated separately in the civil case is because they

18   are taking the position that your ruling, Your Honor, that

19   Pacific Spotters was an alter ego is going to be a ruling that

20   they will challenge in the future.  That's why they're being

21   represented by separate lawyers and that's why we're having to

22   deal with separate lawyers.

23            And for Ms. Ault's information, in case she doesn't

24   know, I did provide the civil defense lawyers with a list of all

25   of the information that I wanted from them and they have that

1  list of all of the information, which is consistent with what was

2  filed in the complaint.  Mr. Walker still owns Pacific  Spotters.

3  Mr. Walker is still controlling Pacific Spotters.  How?  I don't

4  know.  Maybe through Mr. Crowe up until the time that Mr. Crowe

5  resigned.  I don't know, but I don't have to know, Your Honor.

6           What I do know -- and counsel is not refuting this.

7  He's still benefiting from the operation of Pacific Spotters and

8  the Government still does not have the records and the

9  information that it requested.  That's what I do know and nobody

10  is contesting that.

11           THE COURT:  I'm sorry.  So -- okay.

12           MR. MARTIN:  For the record, Your Honor, I contest.

13           THE COURT:  Okay.  Hold on.

14           MR. MARTIN:  I am contesting what Ms. Miller says.

15           THE COURT:  Okay.  Let me just -- okay.  Just so I'm

16  not confused here, because I did review the declaration -- let me

17  see -- by Special Agent Kombunksa.  I'm sorry, are you saying

18  that -- on paragraph 49 of his declaration, he talks about who

19  are certain directors and officers of Pacific Spotters.  And

20  you're saying that those individuals who may be of Filipino

21  descent or Filipino citizens, they're working closely with him or

22  they -- with Mr. Walker?  That's what you're trying to tie Mr.

23  Walker to in terms of control of Pacific Spotters Corporation?

24           MS. MILLER:  Yes, Your Honor.  What I'm saying is that

25  they're nominees of Mr. Walker.  As you see in that affidavit

1   filed by Mr. -- Special Agent Kombunksa, there was never any

2   transfer of funds to or from any of those individuals and Mr.

3   Walker for their ostensible ownership interest in the company.

4   Mr. Espion, for example, he's a mechanic.  Mr. Plew, he's a

5   mechanic.  Mr. Sarimos, you heard his testimony at trial through

6   his affidavit and his report from the FBI.  It was Exhibit G-0008

7   that was admitted into evidence, where Mr. Sarimos basically said

8   I was told by Mr. Kapp to change registration numbers on these

9   helicopters in the Philippines,  so I changed the registration

10  numbers.  I mean, he admitted to doing whatever he was told to

11  do.  All of these individuals do what they're told to do.

12          THE COURT:  Okay.

13          MS. MILLER:  Cherry Espion, who is signing documents on

14  behalf of the Pacific Spotters Corporation, she has another full

15  time all the time job in the Philippines, but she's the one who's

16  signing off on things and she's the one who sent aircraft back to

17  Guam to Hansen Helicopters just a couple of months ago.  She's

18  not doing that on her own, Your Honor.  She's doing that because

19  this is the fraud.  The fraud is in motion.  The fraud was set to

20  continue after John Walker was convicted and it has continued.

21  And if the fraud stops, this is a different conversation, but

22  right now the fraud is still continuing and there has not been

23  clear and convincing evidence that it in any way has stopped.

24          THE COURT:  Okay.

25          MS. AULT:  Your Honor --

1          THE COURT:  Okay.

2          MS. AULT:  -- one thing I did not hear Ms. Miller say

3     at all was that Mr. Walker was in contact with any of these

4     people, that Mr. Walker was doing any of this and that is our

5     contention is that their speculation that Mr. Walker is the

6     mastermind behind all of this is just that, speculation.  And

7     yes, we do have the burden, but we have shown that Mr. Walker has

8     distanced himself, has taken himself out of that management role

9     at Pacific Spotters.  And the only thing they have to refute

10    that, which we have supported with, with his resignation letter

11    and the fact that he is in custody and has had no contact with

12    these people is their speculation that somehow unbeknownst to

13    them, he is still somehow masterminding this, even though they

14    can't figure out how.

15         And that speculation is simply not sufficient to show

16    that he is a danger to the community.  And we acknowledge that we

17    have the burden for that, but we believe we've met that burden

18    and their speculation is not sufficient to overcome our actual

19    evidence and our actual facts.

20         THE COURT:  Let me -- okay.  Thank you, Ms. Ault.  And

21    from the prosecution, Ms. Miller, on paragraph 63, because that's

22    more recent to today, it talks about March 23rd, 2023.  And it's

23    here that you're trying to connect Cherry Espion? Is that right?

24    Cherry Espion?

25         MS. MILLER:  That's correct, Your Honor, Cherry Espion.

                    THE COURT:  Her -- she's trying to register five of the
12 helicopters, right?  That's what it says here.

                    MS. MILLER:  She did, in fact, register five of those
helicopters in the Philippines and then she's the one who sent 12
of those helicopters from Pacific Spotters back to Hansen
Helicopters in March of this year.

                    THE COURT:  So why -- I'm sorry.  So you're -- he's
saying there's further evidence that Walker and Hansen, through
the alter ego corporation, Pacific Spotters and the nominee
continue to operate their fraud in the Philippines, despite the
convictions of Walker and Hansen in September 2022.  That's what
he indicates in his last sentence there.  Right?

                    MS. MILLER:  That's right, Your Honor, because why
would the helicopters be sent back to Hansen Helicopters?  Why
would the individuals at Pacific Spotters tell the -- tell the
Philippine investigator that they work for Hansen Helicopters,
that Hansen Helicopters is their quote, "mother corporation,"
unquote, who they work for?  None of those individuals have any
skin in the game.  It's all Walker.  I don't know how he's doing
it.  He was out until he was remanded.  And we know that Crowe in
September of 2022 --

                    THE COURT:  Okay.

                    MS. MILLER:  -- went out to the Philippines one more
time.  I have no idea what they did to put this in motion, but
it's been in motion and it's so effectively in motion that just a

1    few months ago, 12 of the aircraft came into Hansen Helicopters.

2    And then after that, several more helicopters came into Hansen

3    Helicopters.  And by the way, Your Honor, all of those

4    helicopters were still referencing United States registration

5    numbers that correlate to the second superseding indictment and

6    that correlate to other alter egos of John Walker.  John Walker

7    is still the 99.9 percent owner of Hansen Helicopters.

8           THE COURT:  So, are you -- okay.  So are you saying

9    that this is based on circumstantial evidence because you believe

10   that these nominees are his puppet men and women?  That's what it

11   sounds like you're saying.  So the Court --

12          MS. MILLER:  Absolutely.

13          THE COURT:  -- so the Court --

14          MS. MILLER:  Absolutely, Your Honor.

15          THE COURT:  Uh-huh.  I mean, you don't have any --

16          MS. MILLER:  Yes.

17          THE COURT:  -- you don't necessarily have any direct

18   evidence that Mr. Walker is masterminding this behind the gates

19   of prison, do you?

20          MS. MILLER:  Well, I -- what we have is

21   convictions --

22          THE COURT:  Yeah.

23          MS. MILLER:  -- of 100 counts showing that Mr. Walker

24   was the 99.999 percent owner, effectively the owner of every

25   single alter ego company.  What we have is money laundering

1  convictions showing that as the lease money flowed through the

2  different alter egos --

3  　　　　THE COURT:  Yeah.

4  　　　　MS. MILLER:  -- it ultimately ended up in John Walker's

5  pocket.  What we have are all of the civil attorneys in the case

6  saying that it is John Walker who is paying them to represent all

7  of these companies and him.  And so what has changed?  Nothing

8  has changed.

9  　　　　THE COURT:  No, but I'm just saying that the money --

10 　　　　MS. MILLER:  Now, of course, Mr. Crow --

11 　　　　THE COURT:  -- okay.  But the money -- you're saying

12 that the money that's currently flowing -- I mean, because his

13 operation is -- you're alleging, at least through -- your Agent

14 is alleging through his declaration, that money is -- I mean,

15 don't necessarily know if that money is going towards the

16 attorney's fees and so forth.  You don't know that, but you're

17 saying that there is money coming into Hansen Helicopters.

18 　　　　MS. MILLER:  Yes, Your Honor.

19 　　　　THE COURT:  By moving these --

20 　　　　MS. MILLER:  What I'm saying is --

21 　　　　THE COURT:  By moving these helicopters --

22 　　　　MS. MILLER:  Yes.

23 　　　　THE COURT:  -- from the Philippines to Hansen

24 Helicopters, the -- you're alleging that the fraud is still

25 ongoing?

```
 1            MS. MILLER:  Well, yes.  And Your Honor, we also have
 2   Pacific Spotters filing a petition to have two of these
 3   helicopters that Walker himself stipulated to the forfeiture of
 4   those helicopters.  They're filing a petition saying no, we're
 5   bona fide purchasers for value of these helicopters.  How can
 6   they be pro bona fide purchasers for value of two helicopters
 7   that were seized by the Government back in 2017?  They can't be.
 8            THE COURT:  I mean --
 9            MS. MILLER:  It's impossible.
10            THE COURT:  I mean --
11            MS. MILLER:  It's absolutely impossible.
12            THE COURT:  But I mean, that could be -- I mean, you
13   could argue that it's impossible, but they have the burden of
14   proving that they're bona fide purchasers of value.
15            MS. MILLER:  Right.  Right.  Absolutely, Your Honor.
16            MR. MARTIN:  (Indiscernible - simultaneous speaking)
17   pleading, Your Honor.
18            THE COURT:  What's that?
19            MR. MARTIN:  It's totally ancillary to John Walker.
20   He's forfeited his interest in those, and it's ancillary.  I
21   could come in and claim I'm an owner, if I can prove it to the
22   Court.
23            THE COURT:  Uh-huh.
24            MR. MARTIN:  And for the -- for her to make that leap
25   of --
```

1    MS. MILLER:  Your Honor, the primary owner of Pacific

2    Spotters is still John Walker.  When you look at Exhibit 3003,

3    which is not circumstantial evidence.  It is his own admission.

4    It is his own filings with the Philippine Securities and Exchange

5    Commission.  It is his own representations.  John Walker is

6    saying I own and control this company.  I am the majority

7    shareholder.

8         And when the Philippine SEC came back to him and said,

9    sir, you are an American citizen.  You cannot be a 92 percent

10   owner of this company.  We need Philippine residents to be owners

11   of this company.  You know what John Walker did?  Come here,

12   mechanic.  Come here, mechanic.  Come here, mechanic.  Hey, can

13   you get your wife?  Okay.  You all are now 15 percent owners and

14   directors of the company.  But read Exhibit G-0008 and Exhibit G-

15   006, which was the interviews of both Mr. Sarimos, an ostensible

16   owner and Espion, an ostensible owner.

17        And they both say John Walker is the one controlling

18   everything.  Read Mr. Crowe's declaration made after the

19   indictment.  He says John Walker is the one controlling

20   everything.  It's still John Walker controlling everything.  No

21   one else has a superior interest in Pacific Spotters, any of

22   these helicopters, any of the money coming in or any of the alter

23   egos.  No one else, Your Honor.

24        MS. AULT:  Your Honor --

25        THE COURT:  Okay.

1          MS. AULT:  -- I would just point out that --

2          THE COURT:  Yeah.

3          MS. AULT:  -- Ms. Miller just continues to speculate

4    and speculate.  She's talking about things that happened in the

5    past many years ago.  She's not talking about what's happening

6    now.  What's happening now is that Mr. Walker's only interest in

7    Pacific Spotters is that he is a 32 percent owner of that company

8    and her implication that someone who is a mechanic can't own a

9    company is -- I don't know what that is, but somebody who is a

10   mechanic certainly can own a company.

11         And to say that Mr. Walker, who owns 32 percent of the

12   company, must be controlling it, even though he has no management

13   role, no role on the board, it's like when Elon Musk was a

14   minority owner of Twitter.  In order to get control of the

15   company, he had to go buy the company.  He didn't control it when

16   there was a different board, when there was a different set of

17   management teams.  Minority owners don't control the company.

18         And Ms. Muller is simply wrong when she says he's a

19   majority shareholder.  He's not.  He owns 32 percent of the

20   company. that makes him a minority shareholder.  And he has

21   no -- the -- his current role in the company is simply that, as a

22   minority shareholder and all of her allegations are as the Court

23   said, are just based on speculation.

24         THE COURT:  How --

25         MS. AULT:  And when I was a prosecutor --

1          THE COURT:  Yeah.  Go ahead.  Go ahead.

2          MS. AULT:  I was just going to say when I was a

3   prosecutor, there was something that we were always told to be

4   very careful about, which was confirmation bias, which is wanting

5   to believe that something is true and then trying to look at the

6   evidence and interpret it to conform to your belief, rather than

7   looking at the evidence as, as itself.  And I submit to the

8   Court, if the court looks at the actual evidence that has been

9   put before the Court, it does not show that Mr. Walker is

10  controlling Pacific Spotters.  It shows exactly the opposite.

11         THE COURT:  Let me just -- okay, thank you for that

12  comment or that argument.

13         Ms. Miller, with regard to the 32 percent ownership of

14  Walker, how are you connecting -- is there anything else that

15  you're connecting -- besides the fact that you believe that these

16  are his nominees, how are you connecting his involvement in the

17  current business management?  How are you connecting that with

18  him --

19         MS. MILLER:  As I said, Your Honor --

20         THE COURT:  -- and the nominees?

21         MS. MILLER:  -- they just sent 12 helicopters to Hansen

22  Helicopters.

23         THE COURT:  Okay.

24         MS. MILLER:  John Walker is the 99.99 percent owner of

25  Hansen Helicopters.  Mr. Crowe owned a very miniscule, less than

1 percent interest in it and because of his breakdown in a

relationship with John Walker, he is no longer involved at all.

Mr. Kapp, as you know, Your Honor, has been recovering from his

liver transplant.  Mr. Reed has no ownership interest anymore and

is cooperating with the Government.

THE COURT:  Uh-huh.

MS. MILLER:  The only man standing is John Walker when

it comes to Hansen Helicopters and Hansen Helicopters received

those helicopters just two months ago.  In addition to that, Your

Honor, we submitted to the Court, the report from the Philippine

investigators, who went to Pacific Spotters Corporation and

talked to the individuals at Pacific Spotters Corporation and

those individuals said that they are controlled by Hansen

Helicopters.

This isn't confirmation bias.  This is an objective

report by investigators who were hired by a Philippine law firm

and these are admissions by individuals who did what John Walker

wanted them to do, because he worked for them -- they worked for

him.  So this is information that we obtained this year about

operations that are occurring in 2023.  This is months after John

Walker was remanded and put in jail.  John Walker meets with

people in jail.

Yes, he talks with people on the phone and we have

access to those phone conversations, but we don't have access to

any conversations he has with individuals who visit him in jail.

1    We don't have any access to letters that he sends out to

2    individuals from jail.  We don't have any access to any of that

3    information, Your Honor.  And John Walker is still the sole owner

4    of Hansen Helicopters, who is receiving these helicopters right

5    now to repair, so that they could go out and keep flying.

6            THE COURT:  Okay.  Thank you.  All right.  Anything

7    further, counsels, Mr. Martin or Ms. Ault?

8            MR. MARTIN:  Your Honor, if I might very briefly.

9            THE COURT:  Yeah.

10            MR. MARTIN:  I've been doing this for 40 years, and

11    I've never had a client that received a letter in prison or sent

12    a letter out of a prison that was not read or reviewed by someone

13    in the prison system.  They have access to him.  They have access

14    to all that.  Ms. Miller is still talking in the past.  She's

15    talking to people about things that happened two and three years

16    ago, not things that are currently going on.  There's no evidence

17    that John Walker, that the Government has, is involved in any

18    way, shape or form in Pacific Spotters as we sit here today or

19    since he was taken into custody over 10 months ago.  I'll defer

20    to Ms. Ault.

21            THE COURT:  Okay.  Ms. Ault?

22            MS. AULT:  Unless the Court has any other questions,

23    we will submit.

24            MS. WILLIAMS:  Your Honor?

25            THE COURT:  Yes.  Oh, Ms. Williams.  Yes.

1          MS. WILLIAMS:  May I address one thing, Your Honor?

2          THE COURT:  Yes.

3          MS. WILLIAMS:  I am one of the civil counsel or I am

4    counsel in the civil case and I have been -- just to address the

5    inferences raised that we haven't been cooperative or we're just

6    facially cooperative.  As Your Honor -- it's not our word versus

7    theirs, it's their word versus theirs.  They're the ones who have

8    been filing status reports that say we've been working in good

9    faith, you know.

10          And good faith means something.  And I can represent to

11   the Court, you know, despite what have been -- may have been

12   requested in the complaint, we know that the TRO and the

13   preliminary injunction, those are, you know, those are mid-post

14   towards an end goal, you know, to resolve the case.

15          THE COURT:  Okay.

16          MS. WILLIAMS:  And the Government has represented that

17   we're working in good faith to resolve that just is, you know --

18   we've had conversations as recently as Friday and unfortunately,

19   I couldn't be on that call --

20          THE COURT:  Uh-huh.

21          COURT RECORDER:  -- but my colleagues were, who have

22   the team of civil lawyers, and I did catch up with them

23   afterwards.  And prior to that, I've had at least four calls with

24   the Government, countless emails.  And what we've been doing is

25   we've been negotiating, redlining proposed terms and discussing

1   how we're going to achieve everything they've asked in the

2   complaint and if that's even possible.

3          And in response, I can represent to the Court that my

4   colleagues on the other side, Attorney Paul Kaufman, they say

5   thank you.  Thank you for being so reasonable.  Yes, we'll get

6   back to you.  Let's think about that.  So things have been

7   changing.  What's being demanded in the complaint is not what's

8   been demanded as of this past Friday.

9          So I just wanted to represent to the Court, Your Honor,

10  we are communicating.  Not all of us are on every single call.  I

11  am one of the civil counsels as well.  And we are working in good

12  faith to provide them everything that they tell us that they want

13  at this point in time.

14          THE COURT:  Okay.  Okay.  Thank you for that --

15          MS. WILLIAMS:  Thank you.

16          THE COURT:  -- statement.  Anything else, Ms. Miller?

17          MR. MARTIN:  We have nothing that we have requested.

18  Nothing.  We have no documents.  We have no registrations.  We

19  have no airworthy certificates, we have no bank records, we have

20  no asset confirmation, we have none of the things that we have

21  requested, not one thing.  Have we had lots of discussions?  Yes.

22  Have we had lots of lip service?  Yes.  Have we gotten to inspect

23  the aircraft?  Absolutely not.  We have not gotten to inspect.

24  We have not gotten one piece of paper.  I sent Mack Martin a list

25  of questions for John Walker prior to the TRO hearing that I

asked him to please either answer or assert his Fifth Amendment privilege against self-incrimination. And Mr. Martin said he's going to assert his Fifth to everything. He's not going to answer anything.

Now, I don't want to conflate the criminal with the civil, but Your Honor, we have gotten nothing. And regardless of representations of good faith or whatever, we've gotten nothing. This is not the Government's burden of proof in this hearing. It is the Defendant's. Have they proven to you by clear and convincing evidence that Mr. Walker is not a risk of flight, is not a danger to others or that he will be successful in any arguments on appeal? And their only focus there is Count 10. They're ignoring the other 99 counts. This motion should be denied.

THE COURT: Okay.

MS. AULT: Okay. And Your Honor, I apologize. I just --

THE COURT: Go ahead.

MS. AULT: -- with the Court's indulgence, I just have two more things to say. One, I have to strenuously object to the Government again trying to use Mr. Walker's assertion of his Fifth Amendment rights against him in his criminal case. It is -- I don't even know what to say, other than I have to say --

THE COURT: Well --

MS. AULT: -- that I'm speechless.

1            THE COURT:  No.  Well, let me just say, I recognize

2     that.  Remember, I didn't force Mr. Walker to testify.  I mean,

3     the Court recognizes that he does have the right to assert his

4     Fifth Amendment privilege against self-incrimination.  So we -- I

5     understand that.  You know, I hate to put my probation pretrial

6     officer on the spot, but I would like to ask him, just so you can

7     get an idea.  I do speak to him, FYI, in case the Court decides

8     that Mr. Walker should be released, based on what's been

9     presented to the Court and what -- and is it something that he

10    would recommend.

11            Now he's been sitting here.  He knows Mr. Walker

12    probably more intimately than all of us here in the courtroom in

13    terms of Mr. Walker's -- how he behaves when -- upon release,

14    pretrial and then clearly post-trial, what's been happening.

15    He's been listening to what's been going on.  So, what -- how

16    would you evaluate this, Mr. Ventura?

17            MR. VENTURA:  Yes, Your Honor.  You know, I don't think

18    there are any conditions of release that can mitigate the issues

19    of -- like the Government said, talking about transferring assets

20    and creating or opening additional businesses.  I think it's

21    really important to note, you know, myself back on November 15th,

22    2022, I even asked the Defense counsel, Mr. Martin about

23    disclosure of financial information.  He declined at that time

24    and that was during our presentence interview.

25            Also the Defendant, you know, has had two violation

reports filed against him, ECF 627 and ECF 734, which pretty much

contradicts the exceptional pretrial conduct claim offered today.

Those violations were for possessing 15 firearms back in August

2020 and testing positive for cocaine back on September 2022.  So

based on that I really don't see how this Defendant can be

released.  We're not even talking about the 100 counts of all

felonies that he was convicted with.

THE COURT:  Okay.  So, I mean -- okay, but with regard

to the assets issue, do you think that they should -- you should

-- they should continue to pursue that with you, that the Court

should pause this hearing and not -- and let them continue to

speak to you and to the prosecution in terms of what you might

recommend --

MR. VENTURA:  Well, we might --

THE COURT:  -- to the Court in terms of, okay, is Mr.

Walker a flight risk?  Is Mr. Walker a danger to the community?

And has that been proven by clear convincing evidence that he's

not any of those or one of those?  Yeah, any or both?

MR. VENTURA:  It's difficult to even answer that

question, because there's no full disclosure of finances.  You

know, I'm --

THE COURT:  Okay.

MR. VENTURA:  -- also -- there's been several emails

that I've sent to Hansen helicopters and their Defense counsel.

It's just gone unnoticed or they just give me the runaround, so

1  they haven't submitted any of that.

2          THE COURT:  Okay.  So thank you.  So let me just say, I

3  -- you know, I just wanted you to -- and I hope you don't mind me

4  bringing him in.  I mean, if you want to ask him any questions,

5  you may, Ms. Ault or Mr. Martin, you may, but I mean, I just want

6  you to know that I do speak to him before I make a final

7  decision.  I mean, most federal judges do.

8          MR. MARTIN:  And my concern, Your Honor --

9          THE COURT:  Yes?

10         MR. MARTIN:  My concern, Your Honor, is I told the

11  Probation Officer that on the advice of his counsel, we would not

12  be answering those questions.  And that being, you know, inferred

13  to Mr. Walker, I think is inappropriate --

14         THE COURT:  But here's --

15         MR. MARTIN:  -- Your Honor.

16         THE COURT:  -- the -- but here's -- let me just say.

17  Here's the problem, though.  If Mr. Walker has so many assets,

18  that is an issue for -- in terms of, is he a flight risk?  I

19  mean, does he have the capability to, you know, skip town?  Does

20  he have the capability to leave Guam?  Yeah.  Or -- I'm sorry,

21  Missouri, if, he goes back to Missouri.

22         MR. MARTIN:  Well, Your --

23         THE COURT:  Does he have the ability to go someplace

24  where there's nonextradition?  I mean, the courts look at that.

25  The courts do look at how much assets he has.  Does he have

1   airplanes at his disposal, easy disposal?  Does he have millions

2   of dollars to get away?  I mean, he does face a lot of time

3   potentially, if everything's upheld, you know, and it

4   just -- yeah, I mean, you just can't ignore that, Mr. Martin.

5             MR. MARTIN:  I understand the Court's concern, Your

6   Honor, but he lives a block and a half from the police station in

7   -- right there.  He had --

8             THE COURT:  Okay.

9             MR. MARTIN:  -- if he had an ankle monitor on -- if he

10  has an ankle monitor on, that's instantaneous.  You can tell

11  where he is within a two-foot radius at any time.

12            THE COURT:  Believe me --

13            MR. MARTIN:  If he has to report to --

14            THE COURT:  -- I've had a lot of --

15            MR. MARTIN:  -- the Probation Officer --

16            THE COURT:  -- I've had a lot of defendants who have

17  maneuvered those ankle braces, but, yes, go ahead.

18            MR. MARTIN:  But if he checks in with the Probation

19  Officer every day, they can verify the validity of the ankle

20  monitor, the securing of it and everything else.  I'm submitting

21  to the Court that everything that the Government has -- not

22  everything.  Let me retract that.  That's not accurate.

23            THE COURT:  Uh-huh.

24            MR. MARTIN:  Many of the issues the Government has

25  raised in the hearing today fall right on Mr. Walker's

1  constitutional right, his right to counsel, his right to follow

2  his advice of counsel, his right to refuse to testify in a civil

3  case, which is directly related to his criminal case.  And many

4  of the Government's arguments are things that he has done through

5  counsel, based upon counsel's advice and it's almost offensive to

6  me that the Government has done that repeatedly, not one time but

7  many times.

8           And, you know, he has -- there was a violation of

9  cocaine back in 2020.  Your Honor, I don't -- the firearms, that

10  violation was never, ever filed.  It was noted.  They were gotten

11  rid of --

12           THE COURT:  Uh-huh.

13           MR. MARTIN:  -- and there's never been any issue about

14  him failing to appear to court.  This case has been going on

15  since 2027 -- 2016.  It was -- I'm sorry, it was filed.  I've

16  been involved in it since before then.

17           THE COURT:  Okay.

18           MR. MARTIN:  He's never even been late to court, Your

19  Honor.

20           THE COURT:  Uh-huh.

21           MR. MARTIN:  You let him go home the night that the

22  verdicts were rendered, knowing that the Government had filed a

23  motion to remand.  I met Mr. Ventura at my hotel, gave him Mr.

24  Walker's passport.  We showed up the next day.  We argued our

25  motions.  Mr. Walker, you know, went -- after the Court said, you

1  know, he showed up and voluntarily surrendered.  There can be

2  conditions put into place that assure he does not flee, Your

3  Honor.

4          THE COURT:  Okay.  And --

5          MR. MARTIN:  You know, I don't care if you two put two

6  ankle monitors on him.

7          THE COURT:  Well, Okay.  But are you saying, though,

8  that the Court should -- the Court and the U.S. Probation

9  pretrial officer should not -- well, I mean, they would be

10  ignorant of his assets then.  We have evidence of his assets

11  during the trial.  The Court has heard about his assets during

12  trial, even during some of -- I mean, we have evidence during

13  some of the detention hearings.

14          But are you saying, oh, you know, because it is your

15  burden to prove by clear and convincing evidence that he not --

16  he is not a flight risk or danger.  So you're -- so if you don't

17  have that evidence, then okay.

18          MR. MARTIN:  I'm submitting to the Court that he met

19  with pretrial services when he was -- when I surrendered him.  He

20  wasn't arrested -- when I surrendered him back in May of 2018 and

21  provided his assets to the officer back on that day.  But if he's

22  detained in Guam, Your Honor, at his residence on a home

23  detention, it would be -- about the only way he'll get off the

24  island is if he swims off and because of his ankle monitor,

25  they'll know where he is in the ocean.

1                THE COURT:  Okay.  That's your answer?

2                MR. MARTIN:  I mean, Judge, yes, my answer.

3                THE COURT:  Okay.  Anybody -- anything else?

4                MS. AULT:  Your Honor.

5                THE COURT:  Yes.  Ms. Ault?

6                MS. AULT:  Yes, Your Honor.  Again, we do believe that

7     we've met the burden today, but if the Court disagrees with us

8     and the primary reason the Court disagrees with us is the concern

9     over the assets, then we would ask the court for an opportunity

10    to work with the Probation Officer to see if we can come to some

11    situation that would make a Probation Officer comfortable.

12                THE COURT:  I mean, I --

13                MS. MILLER:  But Your Honor, see, here's the problem.

14                THE COURT:  Uh-huh.

15                MS. MILLER:  They're talking at both sides of their

16    mouths.  On the one hand --

17                THE COURT:  Uh-huh.

18                MS. MILLER:  -- they want to say everything is going

19    great.  We're going to give the Government everything they need

20    to be assured of the fact that John Walker is not continuing his

21    crimes, but you just heard the probation officer say requests for

22    information from Hansen Helicopters have gone ignored.  You just

23    heard Mr. Martin say we can't let John Walker do that because

24    we've advised him not to do that.  You've heard Ms. Ault say none

25    of that has been done and Mr. Walker has his Fifth Amendment.

1          And you know what, the Government agrees.  He

2  absolutely has his Fifth Amendment right to refuse to answer

3  anything.  Even in the civil case, he could tell us, you know

4  what, go pound sand, Government.  I'm not going to give you

5  anything after all because I'm concerned that it will somehow

6  incriminate me.  And in that civil case, Your Honor, the case law

7  says you can draw an inference from it.

8          But let's put that aside for now.  This is not -- we're

9  conflating two issues.  We're conflating two issues.  The Defense

10  is trying to say -- Ms. Ault keeps saying we've met our burden.

11  No, it's clear and convincing evidence.  You just heard the

12  pretrial officer say that there is not cooperation coming from

13  Walker or Hansen.

14          I'm representing to you, Your Honor, and nobody in the

15  courtroom and neither Mr. Martin nor Mr. (sic) Ault can

16  contradict this.  There has been no information provided to the

17  Government about Mr. Walker's assets.  We know that he has tens

18  of millions of dollars' worth of assets.  We know because we've

19  been working on the forfeiture part of the case.

20          He is providing us with absolutely nothing and all of

21  the efforts that we're making to try to get information about how

22  he spread it around or where it is, so far, we've gotten

23  absolutely nothing, which means we don't put a pin in this.  It

24  means the Defendant has failed to meet his burden and the motion

25  is denied and if anything changes in the future and counsel wants

1  to bring a new motion, because there's other evidence, then they

2  could do that, but they have clearly not met their burden, Your

3  Honor.

4          THE COURT:  Okay.  Okay, Ms. Ault, you wanted to speak.

5  Go ahead.

6          MS. AULT:  Your Honor, I -- it's difficult to figure

7  out how to respond, but the Probation Officer said that he last

8  contacted Mr. Walker in November of 2022.  It is now August of

9  2023.  We have had many developments happen in this case since

10  then.  And so if that is the Court's primary concern and having

11  us work with Probation to see if there's something that we can

12  come up with that will make them comfortable, we'll move the

13  needle for the Court, then we are happy to do that and I would

14  request that the Court allow us the opportunity to do that.

15          THE COURT:  Yeah.  Okay.  If there's nothing further,

16  what I'll do -- you know -- yeah, because I don't want you guys

17  to file another motion.  I'm not going to -- you know, we don't

18  want to do it, but I am -- I will say I am concerned about Mr.

19  Walker's assets and I am concerned about this allegation.  I'll

20  tell you upfront, this allegation that he may be still operating

21  Hansen Helicopters through Pacific Spotters.  The Court is

22  concerned about that as it relates to the issue of flight risk

23  and/or danger to the community on that part.

24          So just an FYI.  I don't mind giving you just a few

25  days of a continuance.  I mean, you know, if he doesn't have very

1  many assets or he knows his assets -- I mean, I'm pretty sure he

2  knows his assets, whether they're -- whatever they might be and

3  he probably knows -- I'm pretty sure he should know where they

4  are.

5          And so the Court will give -- today is Tuesday.  The

6  Court will give you all until Thursday to work with U.S.

7  Probation and pretrial, if you'd like and with the Government, if

8  you'd like, either/or.  And to the extent that you don't have to

9  -- to the extent that you feel that your client's rights are not

10 violated and you've given him that advice, I mean, that's totally

11 your prerogative as lawyers and probably your duty for sure as

12 lawyers.

13         But I'm just saying that as the Court is reviewing

14 this, those are at least some of the issues that I am concerned

15 of.  So I don't mind giving you until Thursday to work it out.

16 Submit something in writing.  If you've come to a resolution --

17 well, U.S. Probation can submit something to the Court and it

18 could be filed with all of you.  And we can -- the Court can

19 consider that.  If I feel like I need to have another hearing to

20 discuss any issues.  I will, but I don't have a problem with

21 allowing a short extension, Ms. Ault, Mr. Martin, if you'd like

22 to do that on behalf of your client.

23         MS. AULT:  Your Honor, we appreciate the opportunity

24 and we will certainly take advantage of it.  I'm not -- just to

25 be candid with the Court, I'm not certain that we are going to be

1   able to pull everything together by Thursday.  I would make an

2   alternate proposal of what the Court suggested very early on in

3   the hearing, which was that we complete our negotiations with the

4   Government over the preliminary injunction and once we've done

5   that, that I'm -- will probably so almost all of these issues and

6   then we can kind -- we can present to the Probation Officer what

7   we've come up with and see if that makes the Probation Officer

8   comfortable and then come back to the Court at that point in

9   time.

10          I think that might be a more realistic proposal for us

11  to actually be able to get the Probation Officer and the Court

12  the information that you need.

13          THE COURT:  Well, I would say, not just --

14          MS. MILLER:  I agree with that, Your Honor.

15          THE COURT:  -- I would -- let me just say.  And not

16  only just the Court but also the U.S. Attorney's office.  Yes,

17  Ms. Miller --

18          MS. AULT:  Right.

19          THE COURT:  -- you agree with that?

20          MS. MILLER:  Yeah, I agree with that --

21          THE COURT:  Okay.

22          MS. MILLER:  -- Your Honor.  Absolutely.

23          THE COURT:  Yeah.  Yeah.  I think so, too.  You know,

24  this is -- it's an extraordinary case in terms of your having the

25  civil forfeiture, the alter ego issue running parallel to this

1  particular motion for release and -- you know, pending his

2  sentencing.  So obviously, certain rights will collide both in

3  the criminal context and the civil context.  And in fairness to

4  the Defendant, I think it would be best to allow the Defense

5  counsels, Mr. Martin and Ms. Ault, to work with Ms. Williams and

6  her team with the civil matter and with Ms. Miller on the

7  criminal matter.

8          So we'll -- the Court will hold this matter under

9  advisement.  How's that?  I will hold this matter --

10          MS. AULT:  Thank you, Your Honor.

11          THE COURT:  -- under -- yeah.  I'll hold it on -- this

12  matter under advisement, allow you to renegotiate or continue --

13  excuse me, to continue your negotiation in the restraining order

14  TRO matter, and also to speak to the U.S. Probation and Pretrial

15  Officer.  I will say that Mr. Ventura is very reasonable.  And so

16  the -- you know, just know that the Courts do look to them,

17  because they're the ones that will have to ensure that he follows

18  his conditions of release, if he's released.

19          And you're asking for his release to Guam?  Is that

20  what I understand, Mr. Martin, not to Missouri?

21          MR. MARTIN:  Your Honor, we'd like to go to Missouri,

22  but if the Court wants him in Guam, we're not going to object.

23  We're trying to get him out of custody, but --

24          THE COURT:  Your first option is --

25          MR. MARTIN:  -- we prefer Missouri.

1          THE COURT:  -- Missouri and your second option is Guam.

2   Is that what you're saying?

3          MR. MARTIN:  Yes, Your Honor.

4          THE COURT:  Okay.  Well anyway, the Defendant will

5   continue to be detained, until we -- the Court makes a ruling on

6   this motion.  And I'm happy to reset this back for further

7   hearing as soon as you all complete your negotiations.  Okay,

8   counsel?

9          MR. MARTIN:  Thank you.

10          MS. AULT:  Thank you very much, Your Honor.

11          THE COURT:  Thank you.

12          MR. MARTIN:  Thank you, Your Honor.

13          THE COURT:  All right.  Take care, Ms. Miller, Mr.

14   Martin, Ms. Ault, and Ms. Williams, the Defendant, Mr. Walker.

15   Thank you.  Thank you, Mr. --

16          MS. WILLIAMS:  Thank you, Your Honor.

17          THE COURT:  -- Ventura as well.  Have a nice day,

18   everything.

19          MS. AULT:  Thank you.

20          MR. MARTIN:  Thank you, Your Honor.

21          THE COURT:  Take care, yeah.

22       (Proceedings adjourned at 11:02 a.m.)

23

24

25

CERTIFICATE

I, Jessica B. Cahill, court approved transcriber, do hereby certify that the foregoing is a complete, true, and correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Dated: July 23, 2023

Jessica B. Cahill, CER/CET-708